[Civ. No. 8521. Third Dist. Nov. 8, 1955.]

PACIFIC WESTERN OIL CORPORATION (a Corporation), Appellant, v. FRANCHISE TAX BOARD, Respondent.

Wright, Peeler & Garrett, Musick, Peeler & Garrett, Joseph D. Peeler and John P. Pollock for Appellant.

Edmund G. Brown, Attorney General, James E. Sabine and Irving H. Perluss, Assistant Attorneys General, and Ernest P. Goodman, Deputy Attorney General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment in favor of defendant Franchise Tax Board in an action brought to recover franchise taxes paid by plaintiff under protest. The franchise taxes so paid are attributed to George F. Getty, Inc., a Delaware corporation, hereinafter generally referred to as the taxpayer. Appellant, Pacific Western Oil Corporation, another Delaware corporation, is the successor in interest to the taxpayer.

The taxes relate solely to income received by the taxpayer and a predecessor corporation, Getty, Inc., at their offices in Jersey City, New Jersey, from intangible assets (stocks, bonds and notes) located outside of California. The controversy centers around the propriety of including, in the measure of the franchise tax imposed by California, income received by the taxpayer, George F. Getty, Inc., and its predecessor, Getty, Inc., from these various intangible assets. The income was included in the measure of the franchise tax because, according to the commissioner's contentions, the commercial domicile of the taxpayer and of Getty, Inc., was in the State of California and the security holdings of these corporations were related to and useful in the business activities carried on by them in this state. The issues presented by the appeal relate primarily to the location of the commercial domicile of the taxpayer and of Getty, Inc., and the relationship of their security holdings to their operations in the production and sale of petroleum.

The appellant, Pacific Western Oil Corporation, is a Delaware corporation which on May 31, 1946, succeeded by merger to the assets and liabilities of George F. Getty, Inc., the taxpayer. George F. Getty, Inc., was formed under the laws of the State of Delaware on December 30, 1936. This corporation succeeded under an agreement of consolidation to the assets and liabilities of three corporations, namely: George F. Getty, Incorporated, a California corporation; George F. Getty Oil Company, a Delaware corporation; and George F. Getty Petroleum Corporation, a Delaware corporation. On August 31, 1937, George F. Getty, Inc., also succeeded by merger to the assets and liabilities of Getty, Inc., a Delaware corporation.

### Director Meetings Before and After Merger

For many years prior to June of 1936, all the meetings of stockholders and directors of the corporations which were parties to the consolidation were held in California. Between the latter part of June, 1936, and the date of consolidation, meetings of stockholders and directors of George F. Getty Oil Company and George F. Getty Petroleum Corporation were held in the State of New Jersey. In the case of George F. Getty, Incorporated, such meetings were held in California until the date of consolidation on December 30, 1936. In the case of Getty, Inc., the meetings of shareholders and directors were held in California during the period March 1,

1934, through June 4, 1936. After June 26, 1936, to the date of the merger on August 31, 1937, the meetings of stockholders and directors of Getty, Inc., were held in New Jersey. The meetings of the directors and stockholders of taxpayer George F. Getty, Inc., were held in New Jersey during the period here in controversy.

In the period between January 1, 1936, and June of 1936, Mr. Emil Kluth, who resided in California, was president of Getty, Inc., and of the three corporations which were consolidated to form George F. Getty, Inc. During June of 1936, Mr. Kluth was succeeded as president of all of the companies, except George F. Getty, Incorporated, by Mr. Harold Rowland who resided in New Jersey. Mr. Kluth remained president of George F. Getty, Incorporated, until the date of the consolidation in December of 1936.

### Income From Intangibles

The source of the intangible income here involved was primarily dividends on stock held by George F. Getty, Inc., and Getty, Inc., in various oil companies. In addition, a portion of the income was received as a result of sales of Tide Water Associated Oil Company stock and Pacific Western Oil Corporation stock and from the sale of Pacific Western notes. Finally, a portion of the income consisted of interest on Pacific Western Oil Corporation notes and interest on German bonds. The income from intangibles for the period 1937 through 1939 was as follows:

| | |
|---|---:|
| Dividends | $2,061,332.50 |
| Interest | 327,911.26 |
| Profit on sales of stocks and notes | 351,078.11 |
| Making a total of | $2,740,321.87 |

The dividends were received primarily from Tide Water Associated Oil Company and Pacific Western Oil Corporation. Additional dividends were received from Minnehoma Oil & Gas Company and Richfield Oil Corporation.

### How the Intangibles Were Acquired

On December 31, 1939, George F. Getty, Inc., held 372,454 shares of Tide Water Associated Oil Company stock. All the shares of Tide Water Associated Oil Company stock held by George F. Getty, Inc., were received at the time of its formation from its predecessor corporation, George F. Getty, Incorporated, or from Getty, Inc., at the time of its merger with the taxpayer on August 31, 1937. Neither the taxpayer, George F. Getty, Inc., nor Getty, Inc., purchased any shares

of Tide Water Associated Oil Company stock in the years 1937, 1938 and 1939. No shares of Tide Water Associated Oil Company stock had been purchased by George F. Getty, Incorporated, after January 1, 1934. Getty, Inc., had not acquired any shares of Tide Water stock after June 25, 1935. On December 31, 1939, George F. Getty, Inc., held 679,019 shares of Pacific Western Oil Corporation stock. Of these shares, approximately 6,200 were purchased by George F. Getty, Inc., in the period June 7, 1939, to August 31, 1939. All of the remainder of the Pacific Western stock was acquired by George F. Getty, Inc., from George F. Getty Oil Company upon the consolidation on December 30, 1936, or from Getty, Inc. upon the merger of August 31, 1937, or from Minnehoma Oil and Gas Company on its liquidation in December of 1938. None of the shares received from George F. Getty Oil Company, Getty, Inc., or Minnehoma Oil Company had been purchased by any of these corporations after March 20, 1935. George F. Getty, Incorporated, a predecessor corporation, had acquired 643,664 shares of stock of Minnehoma Oil Company in February of 1933 and 2,270 shares of Minnehoma Oil and Gas Company stock in April of 1934. Upon the consolidation, George F. Getty, Inc., succeeded to these shares of Minnehoma stock. No additional Minnehoma stock was acquired by George F. Getty, Inc., during the period here in controversy. In 1937, George F. Getty, Inc., received a small amount of Richfield Oil Corporation stock which produced a total of $259.50 in dividends. This stock was received in satisfaction of a claim of a predecessor corporation against Richfield Oil Corporation. All the German bonds held by George F. Getty, Inc., were received from Getty, Inc., at the time of the merger on August 31, 1937; of the 666,000 German bonds held by George F. Getty, Inc., on December 31, 1939, approximately 18,000 were acquired by Getty, Inc., during the period here in controversy. George F. Getty, Inc., owned stock in two other corporations, Santa Fe Investment Company and the Getty Realty Corporation. No income derived from either of these corporations is here in controversy. George F. Getty, Inc., received 200,000 shares of stock in the San Fe Investment Company from J. Paul Getty on July 27, 1938, in exchange for a $236,420 note of Pacific Western Oil Corporation. Getty Realty Corporation, a New York corporation, was organized by the taxpayer to own and operate the Hotel Pierre in New York City. George F. Getty, Inc., purchased 500 shares of Getty Realty Corporation stock

on October 11, 1938, for $50,000. This represented all the outstanding stock of Getty Realty Corporation. In 1938 the taxpayer loaned Getty Realty Corporation $2,310,100.

### Payrolls and Employees

In 1937 taxpayer, George F. Getty, Inc., had 496 employees, of whom an average of 463 were employed in California; out of a total payroll of $1,066,638.53, California employees received $993,933.72. During the period here in controversy, George F. Getty, Inc., had four employees in the New Jersey office of that company. These were Mr. Rowland, Mr. Krug and two secretaries. These employees in the New Jersey office worked for a number of other corporations as well as for George F. Getty, Inc.

### Records

At the Los Angeles office of George F. Getty, Inc., the assistant secretary of that company and five other employees were engaged in keeping the accounting records of the taxpayer. The general ledger of the company and the detailed accounting records with relation to oil and gas production were kept at the Los Angeles office. The financial and operating statements of the taxpayer were prepared in the Los Angeles office and forwarded to New Jersey. The annual reports were prepared by the assistant secretary in the Los Angeles office. Each of the offices of the taxpayer kept its own records of cash, receipts, and disbursements which were sent to Los Angeles to be collated and entered into the final operating statement. The accounting records kept by the New Jersey office of the taxpayer consisted of the cash receipts and disbursements book, the stock records of the company, and a record of activities relating to the investments and financing of the company.

### Salaries of Officers

During 1939, Mr. Rowland received a total salary of $6,770, of which $6,415 was paid to him as vice-president, treasurer, and director of Pacific Western Oil Corporation, and $255 was paid for his work as president and director of the taxpayer. He also received $100 as vice-president and director of Mission Corporation. During 1939, Mr. Emil Kluth, vice-president of the taxpayer, received a total salary of $11,300, of which half was charged to the taxpayer and half to Pacific Western Oil Corporation. Mr. H. M. Macomber, another vice-president of the taxpayer, received a total salary of $9,700, of which $6,466.62 was charged to Pacific Western

Oil Corporation and the remainder was charged to the taxpayer.

## Oil Business in California

During the year 1937, the oil, gas, and gasoline sales of the taxpayer in California amounted to $1,425,659.23, while sales in other states amounted to $258,716.46. In 1938, California sales of the taxpayer were $1,533,061.05; sales in other states were $231,101.41. In 1939, the taxpayer's sales in California amounted to $1,435,517.95; sales in other states totaled $232,761.54. In 1937, Getty, Inc., made sales of oil, gas, and gasoline in the sum of $161,696.77; all of its sales were made in California. In 1937, the taxpayer produced a total of 2,181,043 barrels of oil, of which 1,810,660 were produced in California. In 1938, its total oil production was 2,095,648 barrels, of which 1,789,559 barrels were produced in California. In 1939, the total oil production of the taxpayer was 1,959,113 barrels, of which 1,657,470 were produced in California.

## Fixed Assets

At the time of the formation of the taxpayer in December of 1936, the total net fixed assets of the corporation in California were valued at $592,166.81. On December 31, 1939, the value of the net fixed assets in California was $1,236,406.19. The value of net fixed assets in other states was $499,066.17 on December 31, 1936, and $534,002.13 on December 31, 1939. At the time of the merger, the value of the oil properties of Getty, Inc., in California was $234,418.87, and in other states, $2,681.04.

## Oil Income

The taxpayer claimed net losses on its California Franchise Tax returns for 1937 and 1938; and reported a net income of $26,244.02 on its 1939 return. However, the revised net income to be attributed to California for franchise tax purposes, by virtue of the taxpayer's oil operations during the period here involved, was as follows:

| | |
|---|---|
| For 1937 ........................ | $304,577.01 |
| For 1938 ........................ | 185,721.20 |
| For 1939 ........................ | 152,214.67 |

## Returns

The federal income tax returns of George F. Getty, Inc., for the years 1937, 1938, and 1939 were filed in Los Angeles, California. By section 536, subdivision 2, of the Internal Revenue Code, these returns are to be made to the collector

of the district in which is located the principal place of business of the corporation.

### Taxes by Other States

No other state than California has attempted to impose a tax on, or measured by, the income from intangibles here in controversy. (In this connection, it should be stated that the taxpayer contends this factor is the by-product of an exemption clause in the New Jersey franchise tax laws which enabled the corporation to be exempt from New Jersey taxes; and that it does not mean that because no tax was collected by New Jersey, that state thereby indicated in any way that the same income here taxed could not properly be taxed by New Jersey save for the express exemption.) Neither the taxpayer nor Getty, Inc., paid ad valorem property taxes to any state on the intangibles here in controversy.

### Business in State of Creation

The taxpayer did not engage in any business activities in Delaware, the state of its creation, at any time during the period December 30, 1936, to and including December 31, 1939. Likewise Getty, Inc., did not engage in any business activity in Delaware at any time during the period January 1, 1937, to and including August 31, 1937, the date of its merger with the taxpayer.

### Ownership of Taxpayer's Stock

Mr. J. Paul Getty owned all the stock of the taxpayer, either individually or as a trustee. During the years 1937, 1938 and 1939, the legal domicile of Mr. J. Paul Getty was in California, but he leased, and when not traveling, lived in a penthouse in New York City and used the corporate offices in New Jersey.

There is no substantial disagreement between the parties hereto as to the existence of the foregoing facts. The controversy centers around inferences which may be drawn from those facts. The trial court found that the taxpayer and Getty, Inc., had their "commercial domicile" in California during the tax period; that the stockholdings of the taxpayer and Getty, Inc., in other oil companies were connected with the taxpayer's and Getty, Inc.'s petroleum business and were useful in advancing the interests of the taxpayer and Getty, Inc., in the petroleum business. The trial court therefore concluded that inclusion of the income from the intangibles owned by the taxpayer and Getty, Inc., during the

taxing period in the measure of the franchise tax assessed against the taxpayer was valid and that the taxpayer was entitled to no relief in this action.

The concept of a commercial domicile of a corporation has been recognized in this state in the case of *Southern Pac. Co. v. McColgan,* 68 Cal.App.2d 48 [156 P.2d 81]. In that case, income which the Southern Pacific Company, a Kentucky corporation, received from intangible assets was included in the measure of the tax imposed on the company under the provisions of the California Bank and Corporation Franchise Tax Act. There the court determined that the Southern Pacific Company, although not incorporated in California, had a "commercial domicile" in this state and also determined that California had the power to tax income received by the Southern Pacific Company from its intangible assets. The statutory provisions which the court construed in the Southern Pacific Company case were, for the purposes of this case, the same as those in effect during the greater part of the period here involved. Although the statute was amended during the taxpaying period here in controversy, those amendments do not affect the applicability of the rule of Southern Pacific Company case to the issues presented in this case.

In the Southern Pacific Company case, the taxpayer contended that income from its intangibles could not legally be a part of the measure of its tax, under the California Franchise Tax Act, because such income was produced by the taxpayer's stockholding activities and investment activities in connection therewith, which activities, in turn, constituted a separate business from its operations otherwise; and that, therefore, New York, though not the state of its incorporation, was yet its "commercial domicile" with respect to such activities. Here, the taxpayer contends that its activities in respect of its intangibles constituted a separate business from its petroleum business and that not Delaware, the state of its incorporation, but New Jersey, where it maintained offices and where its directors met and where its intangible assets were physically held, was its "commercial domicile" with respect to such activities. Conversely, the taxpayer insists that its petroleum business conducted in California and for most of the taxpaying period also in the mid-continental field, was a business separate and apart from its intangible assets activities. The holding in the Southern Pacific Com-

pany case is not challenged as a rule of law. The contention of the taxpayer is that the rule has no application under the facts disclosed by the record here. Says the appellant: ". . . [T]his appeal, as did the trial court's determination below, depends upon the factual inferences, the ultimate findings of facts and the legal conclusions to be made from such inferences and findings in a record where there is no real dispute as to the detailed facts."

Appellant claims it conducted an investment business. In support of its claim that, during the taxing period involved, taxpayer was engaged in a separate business, distinct from its oil production business, consisting of the handling, the investing, and the managing of its intangible assets, taxpayer points to the following matters appearing in the testimony:

At the time of its organization, taxpayer acquired oil properties in the State of California carried on its books at $592,166.81 and oil properties in other states carried on its books at $499,066.17, or a total of $1,091,232.98. Current assets were valued at $882,880.62, prepaid and deferred charges at $34,353.61, and total investments were carried on its books at $8,355,871.39. These investments included the following:

*Book Value*

| | | |
|---|---|---|
| 316,000 shares Pacific Western Oil Corp. | $2,130,493.57 |
| 337,700 shares Tide Water Associated Oil Co. | 2,240,545.00 |
| 645,934 shares Minnehoma Oil & Gas Co. | 1,614,835.00 |
| Notes of Pacific Western Oil Corp. | 2,391,997.82 |
| Stock Purchase Options | 45,000.00 |

For purposes of the consolidation, a valuation was made of the various assets as of December 30, 1936. This valuation reflected a total value of $4,500,000 for all the oil properties in California and other states, as compared with a total value of $21,913,216.32 for the intangibles. On August 31, 1937, taxpayer acquired by statutory merger all the assets and liabilities of Getty, Inc., a Delaware corporation, qualified to do business in New Jersey and California. At the time of the merger, Getty, Inc., carried on its books California oil properties at a net cost of $234,418.87 and oil properties outside of the State of California at $2,681.04, or a total of $237,099.91. In addition, it had current assets of $63,319.03 and investments which it carried on its books at a cost of $2,779,956.26. A valuation of these assets for the purpose of the merger showed the oil properties of Getty, Inc., were worth $237,099.91, as compared with a value of $7,331,905.66

for the investments. As of the date of the merger, the oil properties of George F. Getty, Inc., in all states were valued at $5,500,000, while the investments were valued at $23,166,324.04. For some time prior to 1936, predecessor corporations of the taxpayer had concluded that it was much more advantageous for them to expand by acquiring securities and possible control of other corporations than to put their money into actual oil operations. In furtherance of this decision, they had started out by acquiring control of Pacific Western Oil Corporation and were making investments in Tide Water Associated Oil Company and Mission Corporation. After acquiring a substantial block of Tide Water Associated Oil Company, directly and through Mission Corporation, they had endeavored with Mission Corporation to obtain influence in the management of that corporation. This developed into a proxy fight early in 1936 which was lost. Such predecessor corporations concluded that in order to protect and enhance their investment in Tide Water Associated Oil Company and to carry on their other investment activities, it was essential to remove the principal office from California to the East, inasmuch as the headquarters of Tide Water was in New York, the bankers they had to do business with were in New York, and most of the stockholders in Tide Water were located east of the Mississippi River. They decided to engage a Wall Street firm of attorneys and enlist the assistance of New York bankers in an endeavor to assert a larger influence on Tide Water to protect and enhance their investments in that company. They decided it made good business sense to move to the East so that the general head office would be close to the pulse of the activities in their expanding program. Accordingly, in March, 1936, the predecessor corporations of the taxpayer established their executive office and headquarters at 15 Exchange Place, Jersey City, New Jersey, across the river from New York City and within five minutes commuting time on the Hudson Tube. On June 26, 1936, the directors of Getty, Inc., adopted a resolution establishing 15 Exchange Place, Jersey City, New Jersey, as "the principal office of this company outside of the State of Delaware." At the same meeting the directors changed the by-laws to provide that meetings of the stockholders of the corporation be held at the New Jersey office and elected Harold L. Rowland, a resident of the State of New Jersey, as president in place of Mr. Kluth. The directors passed at this meeting a resolution authorizing the California

officers to handle "the operation of this corporation's oil properties in California," but providing that they should have no power, without the express direction and approval of the head office in New Jersey, to (a) acquire new leases, (b) execute contracts, or (c) sell any oil except "spot oil." At the first meeting of the board in New Jersey, Harold L. Rowland, Millard F. Tompkins, Jr., and Charles F. Krug, Jr., all residents of New Jersey, were elected directors of the company while Mr. Rowland was elected president and Mr. Krug was elected secretary and treasurer. Authority was also given to various persons, all located in the East, to handle brokerage accounts and to arrange for loans. The by-laws provided that board meetings and stockholders' meetings were to be held at the New Jersey office. From the inception of the taxpayer and throughout the years 1937, 1938 and 1939, the business activities carried on, in or from the Jersey City, New Jersey, office by the taxpayer included the following: Holding of all directors' and stockholders' meetings; activities in connection with the purchase and sale of securities, the collection of dividend and interest income and profits from the sale of securities; the obtaining of financing; activities in connection with enhancing and protectig the taxpayer's investments. In summation, appellant points out that during the years 1937, 1938 and 1939 the purchases, sales, loans, etc., as described, all in the Jersey City office, amounted to total transactions of more than $7,000,000 and resulted in capital gains of more than $300,000.

Neither the taxpayer, nor Getty, Inc., was a California corporation; and neither was a New Jersey corporation. Both were incorporated under the laws of Delaware, and neither, at any time here material, conducted any business operations in that state. Thus the domiciliary status of both corporations with respect to the State of Delaware was no more than paper status.

With the foregoing evidence before it, the trial court made the following findings of fact:

That the three corporations, George F. Getty, Incorporated, George F. Getty Oil Company and George F. Getty Petroleum Company, which were consolidated to form the taxpayer, George F. Getty, Inc., were primarily interested and engaged in the petroleum business for many years immediately prior to the consolidation of these corporations. By far the greater portion of their business affairs and activities were carried on and managed in, and protected

by, the State of California. Throughout the period December 30, 1936 to and including December 31, 1940, the taxpayer George F. Getty, Inc., was engaged in business in the State of California. Throughout the period December 30, 1936, to and including December 31, 1939, among all the states in which it carried on business activities, the taxpayer George F. Getty, Inc., received the greatest protection and benefits from the State of California. In that state were kept the principal accounting records of the taxpayer. Throughout the critical period the taxpayer was primarily and principally engaged in the petroleum business and was not engaged in the investment business. Throughout the same period, by far the larger portion of the activities of the taxpayer, George F. Getty, Inc., were carried on, conducted, managed, and controlled by the taxpayer in the State of California. On, and after, May 1, 1938, the effective date of an agreement with the Skelly Oil Company, the taxpayer had no employees engaged in oil production activities outside of California. The corporations in which the taxpayer held stock (outside of the Getty Realty Co.) were connected with the petroleum business of said taxpayer and these stockholdings were useful to the taxpayer in advancing its petroleum business. The taxpayer permanently held stock in other corporations in the petroleum industry in order to advance its interests in the petroleum industry and did not acquire stock for the purpose of trading in shares; no substantial sales of stock were made by the taxpayer. The holding of stock in other corporations engaged in the petroleum business was useful to the taxpayer in providing a proper and sufficient marketing outlet for its petroleum products. The activities of the taxpayer in the petroleum industry were not managed or controlled by the New Jersey officers of taxpayer, but were managed and controlled by the California officers. The taxpayer during the critical period engaged in no business activities in the State of Delaware. Neither Delaware nor New Jersey, nor any other state, collected or levied a property tax on the intangibles of the taxpayer, nor did any state other than California collect or levy any tax on the income or measured by the income received by the taxpayer from these intangibles. Finally, the court found that throughout the tax period the commercial domicile of the taxpayer, George F. Getty, Inc., was in California; that said taxpayer did not have a commercial domicile either in the State of New Jersey or in the State of Delaware, or in any other

state than California; and that throughout the period the principal place of business of the taxpayer was in California.

It is not seriously contended that if the record furnishes support for the fact findings of the trial court hereinbefore related, then those findings justify and support the conclusions of law and the judgment which has been appealed. Respondent, contending that the factual support is sufficient, states the following summary of facts:

██ The commercial domicile of the taxpayer was in California during the tax period because: (1) The revenue from sales of gas, oil and gasoline in California was many times greater than the revenue derived from sales in all other states combined. (2) The value of the fixed assets of the taxpayer in California were several times the value of fixed assets in other states. (3) Throughout the period here in controversy between 90 per cent and 99 per cent of the employees of the taxpayer were performing their services in California. (4) The income from intangibles here in controversy has not been taxed by any state other than California. (5) The day to day management of the oil, gas, and gasoline production and sales activities of the taxpayer was carried on in California. (6) Payments in connection with the maintenance and operation of plaintiff's petroleum business were made from its Los Angeles office, including payrolls. (7) The principal accounting records of the taxpayer were kept in California. (8) The predecessor corporations which were consolidated to form the taxpayer were managed and controlled in California and their principal activities were carried on in this state. (9) The taxpayer did not carry on any business activity in Delaware, the state in which it was incorporated. (10) The taxpayer filed its federal income tax returns in California (such returns under the provisions of the Internal Revenue Code must be filed in the district where the taxpayer has its principal place of business or principal office or agency). (11) Mr. J. Paul Getty, who held all of the shares of the corporation either individually or as a trustee, had his legal domicile in California during the years 1937 to 1939 inclusive. (12) The directors of the taxpayer followed a practice of ratifying the completed acts of the California officers of the corporation with respect to oil production activities rather than directing the California officers in advance with respect to the procedures they should follow. In 1939, in its annual report, the taxpayer stated: "The principal transactions for the year 1939 were in connection

with direct oil operations.'' The same report pointed out that in 1939 the taxpayer realized a 17.8 per cent profit on its direct oil operations as opposed to a 6.1 per cent return on its other investments; throughout the tax period California was the center of oil production activity of the taxpayer as is shown by the record of oil production, in barrels, hereinbefore stated. The net oil, gas and gasoline sales of the taxpayer during the tax period in California totaled about 4,500,000 barrels, while such sales in other states during that period totaled about 750,000 barrels. During the period January 1, 1937, through August 31, 1937, the net income of Getty, Inc., from sales of oil, gas and gasoline was $161,696.77, all of which was realized from sales made in California.

From an examination of the entire record, we are satisfied that the factual findings of the trial court all find substantial support therein. And of course when we say this, we are deciding this appeal for the reason that, as heretofore noted, the parties do not dispute but that if the trial court findings are supported by the evidence then the judgment appealed from must be affirmed. There is no doubt but that there is in the record much that supports the trial court's findings and there is also much that militates against those findings. But this situation of the record does not aid or comfort the appellant.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied December 2, 1955, and appellant's petition for a hearing by the Supreme Court was denied December 28, 1955.