469 So.2d 1029 (1985)
COLONIAL BANK
v.
PIER FIVE, INC., William P. Bosworth, III and Pascale Rodosta, Jr.
No. CA-2011.
Court of Appeal of Louisiana, Fourth Circuit.
April 30, 1985.
Rehearing Denied June 5, 1985.[*]
*1031 Conrad Meyer, III, Monica T. Surprenant, New Orleans, for plaintiff-appellant, Colonial Bank.
Henry L. Klein, New Orleans, for defendant-appellee, William B. Bosworth, III.
Before GULOTTA, SCHOTT and WARD, JJ.
WARD, Judge.
Colonial Bank brought this suit seeking a deficiency judgment against several parties on a promissory mortgage note: Pier Five, Inc., the maker of the note, and William Bosworth, III and Pascale Radosta, Jr., endorsers of the note. The deficiency sought is the balance due on the note after Colonial Bank foreclosed by executory process, and the Trial Court ordered seizure of the mortgaged property, followed by an appraisal, judicial sale, and application of the proceeds to the note. Although the Trial Court held Pier Five, Inc. liable for the deficiency, it rendered judgment in favor of the endorsers, Bosworth, III and Radosta, Jr., releasing them from liability. Colonial Bank has appealed that part of the judgment in favor of Bosworth, III and Radosta, Jr; Pier Five, Inc., now without assets, has not appealed.
We reverse and hold Bosworth, III and Radosta, Jr. severally liable as endorsers of the note, and liable in solido for the deficiency under a separate Continuing Guaranty of Suretyship.
Colonial Bank's claims arise from financial transactions that provided funds for the construction of a building to be used as a restaurant known as "Mr. M's." Early in 1976, one of the defendants, Pascale Radosta, Jr., and William Bosworth, Jr., the father of the defendant, William Bosworth, III, agreed to open a restaurant in a building they would construct in the central business district of New Orleans. Bosworth, Jr. was experienced in construction and finance; Radosta, Jr. was experienced in restaurant management. They incorporated Pier Five, Inc., as a parent company for "Mr. M's", and Bosworth, Jr. and his son, Bosworth, III, acquired sixty-five percent of the stock, while Radosta, Jr. and his sons acquired the remaining thirty-five percent. After the incorporation, Bosworth, Jr. contacted Colonial Bank, with whom he had previously done business, to secure interim construction money. On February 27, 1976, a commitment letter was issued, and Colonial Bank, with Monroe Building and Loan Association participating, agreed to provide interim construction money to Pier Five if Bosworth, Jr., Bosworth, III, and Radosta, Jr. personally guaranteed the loan. Shortly thereafter Bosworth, III and Radosta, Jr. each entered into a "Continuing Guaranty", in which each accepted responsibility for $1,000,000.00 of the debts of Pier Five. Bosworth Jr., did not give a "Continuing Guaranty," although the commitment letter required it.
Nonetheless the loan was made, and construction began in May of 1976. The building was completed December 7th of that year. After completion, Colonial Bank agreed to provide the permanent financing, with Monroe Building and Loan again participating. To obtain the permanent financing, on February 1, 1977 Pier Five, Inc., through its president, Bosworth, III, executed a note for $1,060,000.00, secured by a first mortgage on the land and building. The note was personally endorsed by Bosworth, Jr., Bosworth, III and Radosta, Jr. In addition to the first mortgage, the entire stock of Pier Five, Inc. was pledged to the Bank to secure the note.
In the meantime, Radosta, Jr. had become ill and could not manage the restaurant. *1032 In spite of Radosta's illness, "Mr. M's" opened in December of 1976. For a brief period it fared well under the management of Bosworth Jr., Bosworth, III, and Radosta's sons, Jay and Scott. However, the relationship between the Bosworths and the Radostas soon became strained, and finally it ruptured. After some negotiations the Bosworths agreed to sell their interest to Scott Radosta's father-in-law, Whitney Porrier. The sale took place May 31, 1977, and thereafter the Bosworths had nothing to do with operation of "Mr. M's." Things went badly; Porrier and the Radostas argued; and finally, when they could not resolve their differences, Porrier bought out the Radosta interest in January of 1978. Business did not get any better, and in September of 1978, Porrier, who then owned all the stock, sold it to Charles Phillippi.
When Radosta sold to Porrier, Bosworth, Jr. complained to the Bank about the operations and financial status of "Mr. M's." When Porrier sold to Phillippi, Bosworth, Jr. again complained to the Bank and asked that it foreclose on the mortgage. On September 1 and on October 1, 1978, Pier Five defaulted. In the meantime, Bosworth, Jr., fearing the worst, attempted to find a buyer to forestall foreclosure because both he and his son were endorsers on the note to the Bank.
On October 16th, Phillippi notified Colonial Bank that Pier Five could not make the payments on the note. On October 18th, Colonial Bank sent formal notice of default to Phillippi, and when payment was not made, Colonial Bank filed for foreclosure on November 21st. Although he neither possessed nor owned the stock of Pier Five, on December 13, 1978 Bosworth III notified Colonial Bank that he was "taking over" the restaurant. On January 11, 1979, the mortgaged property was offered for public sale after advertisement and appraisal, but no bid in excess of the minimum two-thirds was received. On February 22, 1979, the property was offered for sale with no minimum bid requirement, and the Colonial Bank purchased the property for $210,000.00. After applying the purchase price less judicial costs to the balance on the note and accumulated interest, the deficiency at the time this suit was filed was $1,030,966.77.
Colonial Bank claims Bosworth, III and Radosta, Jr. are liable as endorsers of the promissory note of Pier Five, Inc. and additionally, as guarantors under their prior continuing guarantees of $1,000,000.00 of Pier Five's debts.
As to their liability on the mortgage note, Bosworth, III and Radosta, Jr. contend they were released as endorsers because the Bank permitted the dissipation of the security for the loan. This was done, they argue, when the Bank allowed Phillippi to continue to operate the restaurant when it knew he was incompetent. They rely on Louisiana Civil Code Article 3061 and La.R.S. 10:3-606:
The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety.
La.C.C. art. 3061.
(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
* * * * * *
(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.
* * * * * *
La.R.S. 10:3-606.
After finding that Colonial's actions both before and after foreclosure reduced the value of the restaurant, the Trial Court held the security for the note was impaired and Bosworth III and Radosta, Jr. were not liable for any deficiency.
We believe that the Trial Court erred. The defendants have misplaced their focus when they rely on La.C.C. art. 3061 and 10:3-606(1)(b). Both the Trial Court and the defendants have misconstrued the nature of the security for the mortgage note. The security described in the mortgage is the land and the improvements on it, not the restaurant, "Mr. M's." There is no evidence to show, nor is it even contended, that Colonial impaired the land *1033 or those improvements before filing its foreclosure petition. After foreclosure the Civil Sheriff, not the creditor, assumes custody and corresponding liability for preservation of the seized property. La.C.C.P. Art. 328. The creditor, in this instance Colonial Bank, has no duty to administer the seized property, nor does the Bank have a duty to go into the restaurant business to operate it for the debtor.
Bosworth III and Radosta Jr., in arguing that the Bank impaired the security for the note by not removing Phillippi as manager, apparently believe the Bank had this authority because it was pledgee of the stock of Pier Five. They cite no authority for this novel idea and we can find none, nor do we believe any exists. The Bosworths and the Radostas sold the stock to Phillippi, even though it remained pledged to the Bank. A pledge is nothing more than delivery of an asset to secure a loan. A pledge does not transfer rights of ownership, La.C.C. art. 3154, et seq., and in this instance, the pledge of Pier Five's stock did not transfer ownership to Colonial or give it the right to vote the stock to remove Phillippi as manager of the restaurant.
Secondly, Bosworth III and Radosta Jr. argue that the Bank agreed to suspend its right to enforce the note against Pier Five, and, as a consequence, they are released. They rely on R.S. 10:3-606(1)(a):
(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral....
* * * * * *
We find nothing in the record to support this argument. There was a conversation between Mr. Herbert of Colonial Bank and Phillippi on December 1, 1978 in which Mr. Herbert assured Phillippi that the "foreclosure" would take at least thirty days; but this statement was an obvious reference to the judicial sale of the property, because the foreclosure petition had already been filed. The record shows that Pier Five defaulted September 1 and October 1, 1978. The Bank notified Pier Five of the default, "putting it in default" on October 16, and filed a petition for executory process on November 21. This certainly cannot be construed as a suspension of Colonial's rights against Pier Five.
Bosworth, III also contends the Bank is equitably estopped from collecting the deficiency. After it acquired the property at the second judicial sale, the Bank looked for prospective buyers. Bosworth, Jr. prevailed on a friend, E.B. Brazile, to purchase the property from the Bank. The sale to Brazile took place September 10, 1979, more than one year after the default and more than ten months after the judicial sale. After the sale to Brazille, the Bank demanded the balance from all of the endorsers. Neither Bosworth, Jr. nor Bosworth, III paid the balance, and Brazile defaulted within three months. There is nothing in the record to show grounds for equitable estoppel or a novation; that is, that the Bank promised to forgive the Bosworths' deficiency if Bosworth, Jr. found a purchaser. We find no equity to favor Bosworth for producing a purchaser who himself was insolvent.
Next, Bosworth, III and Radosta, Jr. argue that because the Bank failed to make them defendants to the foreclosure against Pier Five, they are released as sureties. Bosworth III and Radosta, Jr. did not have any interest in the mortgaged property, nor did they execute the mortgage, nor did they sign the mortgage note as co-makers, binding themselves in solido with Pier Five. Rather, Pier Five is the sole mortgagor, while Bosworth, III and Radosta, Jr. are endorsers on the mortgage note, accommodation parties within the meaning of La.R.S. 10:3-415. The Official Comments to 10:3-415 recognize that an accommodation party is always a surety. And Article 1-103 of the Commercial Laws requires application of the Louisiana law of suretyship:
Unless displaced by the particular provisions of this Title, the other laws of Louisiana shall apply. *1034 Consequently, as sureties, Bosworth, III and Radosta, Jr. bound themselves to pay Colonial Bank only if Pier Five, Inc. did not. La.C.C. art. 3035. Colonial, therefore, could elect to proceed first against Pier Five and the mortgaged property without joining Bosworth, III and Radosta, Jr. as defendants. This holding is consistent with what we believe is the intent of the parties and what we know to be the accepted practice: a creditor will first attempt to collect from the principal debtor by seizure and judicial sale of the mortgaged property, and then only if the sale does not satisfy the debt, will it sue endorsers who are sureties. We conclude that Bosworth, III and Radosta, Jr. need not be named as defendants under these circumstances.
Finally, in a supplemental brief, Bosworth, III and Radosta, Jr. claim they are immune from a deficiency judgment by operation of R.S. 13:4106, the Deficiency Judgment Act:
If a mortgagee or other creditor takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency.
* * * * * *
Bosworth, III and Radosta contend that because Colonial did not make them defendants in the foreclosure, and because they did not receive either a demand for payment or notice of their right to appoint an appraiser, they are released as sureties.
They rely primarily on this Court's decision in Exchange National Bank of Chicago v. Frank Spalitta, 295 So.2d 18 (La.App. 4th Cir.1974). Counsel contends Spalitta, makes "clear that unless a guarantor is served with each and every pleading and/or notice required under the deficiency judgment act R.S. 13:4105, et seq., there can be no recovery against an endorser or guarantor." Colonial argues that Spalitta was reversed, hence it has no application. Although the Supreme Court reversed, it held only that the Louisiana Deficiency Judgment Act did not apply to sales of mortgaged property when those sales took place under Federal Bankruptcy Act reorganization proceedings. Exchange National Bank of Chicago v. Spalitta, 321 So.2d 338 (La.1975). We believe Spalitta otherwise states valid principles applicable today. Counsel for Bosworth III and Radosta, Jr. have misconstrued those principles and misplaced their reliance on Spalitta. Those principles may be summarized:
1) The forms of law must be scrupulously followed in foreclosure proceedings;
2) When the forms of law are not followed, the Deficiency Judgment Act discharges the principal debtor from any further obligation to the creditor;
3) A surety may interpose all non personal defenses available to the principal debtor;
4) The surety can interpose the principal debtor's defense that the forms of law were not followed in the executory process, a non personal defense, and the surety is discharged;
5) Additionally, a surety is discharged when his right to subrogation to the creditor's rights is destroyed;
6) A surety's right of subrogation to the creditor's rights is destroyed when, because of the Deficiency Judgment Act, the principal debtor is discharged from any deficiency owed to the creditor.
There is absolutely nothing in Spalitta to give support to Bosworth, III and Radosta, Jr.'s claim that they are protected by the Deficiency Judgment Act because they were not made defendants or served with demand for payment or given notice and opportunity to appoint appraisers. The law is to the contrary. Whitney National Bank of New Orleans v. Vincent J. Derbes, et al., 436 So.2d 1185 (La.App. 4th Cir.1983), writs refused, 441 So.2d 1220 (La.1983). The forms of law were scrupulously *1035 followed as to the principal debtor, Pier Five, and the creditor, Colonial Bank, need not do more. Since Pier Five was not discharged, neither were Bosworth, III or Radosta, Jr.
There is authority in Consolidation Loans, Inc. v. Guercio, 200 So.2d 717 (La. App. 1st Cir.1967) for the proposition that unless a co-maker who is named as a defendant in a suit for executory process is served with demand for payment, judicial sale of the property will release that person from liability for any deficiency. That decision rests squarely on La.C.C.P. art. 2639:
Before issuing the writ of seizure and sale, the clerk shall issue a demand upon the defendant for payment of the amount due and all costs of court. This demand shall notify the defendant that, in default of payment within three days of service, exclusive of holidays, a writ of seizure and sale will be issued and the property described in the petition will be seized and sold according to law.
* * * * * *
Unlike the defendants in Guercio, supra, Bosworth, III and Radosta, Jr. did not have an ownership interest in the property, they were not co-makers on the note, obligated as principal debtors in solido, and they need not have been made defendants. As a further consequence, neither La.C. C.P. art. 2639, nor Guercio is applicable. Article 2639 by its literal terms says demand for payment must be made on defendants, and Guercio holds this to include co-makers liable as principal debtors. It does not apply to sureties who are only secondarily liable.
Because we believe Bosworth, III and Radosta, Jr. are liable as sureties for the full deficiency, we have not addressed the issue of the Continuing Guaranty, signed by each. As a separate suretyship contract signed before either endorsed the note, the terms of that contract bind both. None of the defenses raised by Bosworth, III and Radosta are applicable to it. By its terms, it is for an amount less than the entire deficiency, and hence, full discussion of the liability of Bosworth, III and Radosta as endorsers of the mortgage note was necessary. Moreover, after this suit was filed, Colonial Bank transferred the mortgage note to its participating partner, Monroe Building and Loan Association, and Bosworth, III and Radosta, Jr. are liable on the note to Monroe, while liable to Colonial under the Continuing Guaranty. We hold Bosworth, III and Radosta, Jr. liable for the present deficiency which includes the interest of the mortgage note, until paid, and each is also liable for $1,000,000.00, under the Continuing Guaranty for any other debt of Pier Five, Inc. to Colonial Bank.
Reversed. All costs of appeal are to be paid by William Bosworth, III and Pascal Radosta, Jr.
REVERSED.

REASONS FOR DENYING REHEARING
WARD, Judge.
I believe the application for rehearing should be denied. Nonetheless, in the application, counsel for William Bosworth, III correctly points out several minor errors in the original opinion, not the least of which is the misspelling of Mr. E.B. Breazeale's name. These errors, while regrettable, do not affect the holding of our opinion.
Counsel for William Bosworth, III alleges misstatements of fact which are matters of interpretation of the record. He believes he has found errors of fact because his interpretation is biased in favor of his client, causing him to confuse the facts with conclusions which are not supported by the record.
First, counsel contends it was proved as fact that Colonial Bank promised to forego the deficiency if Bosworth, Jr. found a purchaser for the restaurant, "Mr. M's"; secondly, that "payment" was made when Moonraker, Inc. bought the property; and thirdly, that Colonial Bank credited the Bosworths with the proceeds. Additionally, counsel re-urges the doctrine of equitable estoppel which was rejected in our original opinion.
The record shows that none of these issues were raised in the Trial Court much *1036 less pleaded as affirmative defenses as required by La.C.C.P. Article 1005. Consequently, evidence to show either estoppel or extinguishment of the debt was not admissible. Perhaps for this reason, payment was not argued to this Court in the prehearing brief, at oral argument, or in the supplemental brief, although equitable estoppel was briefly mentioned in the supplemental brief. In any event, the record does not support any of these defenses.
Neither Bosworth, Jr. nor Bosworth, III testified that Colonial promised to forego the deficiency, nor did counsel for Bosworth question Mr. Herbert of Colonial Bank as to whether he or anyone else promised to forgive the debt if a buyer were found. Neither does the letter from Colonial Bank to Bosworth, Jr. (exhibit B-17, attached to the application for rehearing) prove the promise was made, as counsel in his application for rehearing contends. The letter does indicate a willingness of the Bank to apply the proceeds of the sale to the deficiency if Bosworth, Jr. paid the amount due on the deficiency over and above the proceeds of the sale to Moonraker. However, Bosworth, Jr. made efforts to pay the remaining deficiency after the sale to Moonraker, Inc.without complaint to anyonestrong evidence indeed that the Bank's offer to forgive the deficiency was never accepted. Most certainly, had the Bank promised Bosworth, Jr. that it would forego the deficiency, the defense to the suit for the deficiency would have been payment or novation, not that the security for the loan was destroyed and the surety discharged. Since it was neither pleaded, briefed, nor argued, Counsel's present argument either was negligently omitted or it never existed; it is apparently only an afterthought asserted in this application for rehearing. Moreover, early in the trial the judge correctly sustained an objection, holding that evidence of a subsequent private sale of property purchased at a judicial sale is improper. Although the Trial Court later permitted testimony, none was admissible because extinguishment by payment or novation is an affirmative defense which must be pleaded. Hence the Trial Court's first decision was the correct one.
Even though the evidence was not admissible, one of counsel's allegations should be answered, because of his inference of impropriety by Colonial Bank. That is, counsel impliedly complains that the balance demanded by the bank continued to increase each month, as though it were some plot of extortion and not merely interest continuing to run on the unpaid balance. Obviously, a balance unpaid one month will not be the same as that due months later.
Counsel also asks that we determine the exact amount due to Colonial, but it is not the function of this Court to provide such calculations. If the parties are unable to agree on the full amount of principal, interest and costs due under the judgment, they may return to the Trial Court for a resolution of the problem.
NOTES
[*] Ward, J. assigns reasons for refusing application for rehearing.