WICKER, Judge.
This appeal arises from a suit for corporation income taxes brought on behalf of Shirley McNamara in her capacity as Secretary of the Department of Revenue and Taxation for the State of Louisiana (the State) against George Engine Company, Inc. (GECO), a Louisiana corporation with its commercial domicile in Louisiana. After the case was submitted on numerous stipulations, the trial court rendered judgment in favor of GECO, dismissing the State’s suit. We reverse and remand.
The stipulations set forth the following pertinent facts: GECO is a corporation duly organized and validly existing under the laws of Louisiana. Since 1972 GECO's principal place of business, registered office and commercial domicile have been in Jefferson Parish, Louisiana. At all pertinent times, GECO has been engaged in the manufacture, modification, repair and sale of diesel engines as a franchise dealer of Detroit Diesel Allison Division of General Motors Corporation (GM/DDA) in Louisiana.
Although GECO was allowed to sell products and parts to customers wherever they may be located, it could not use any trademark materials of GM/DDA outside of its franchise territory in South Louisiana. In addition, the franchise agreement prohibited GECO from directly or indirectly establishing any place or places of business except those in South Louisiana.
In 1972 GM/DDA was operating a diesel engine sales and service facility in Miami, Florida. GM/DDA offered to franchise this operation to G.S. Frierson, Jr. (Frier-son), who was then president of GECO. However, since GECO could not operate a second distributorship, GM/DDA required Frierson to “form an entirely separate subsidiary for the distributorship which would operate as a completely separate organization and profit center responsible for its own performance, profits and growth.”
On May 12, 1972 Key Power Systems, Inc. (KPSI) was incorporated under the laws of the State of Florida. GECO owned 10,000 shares or 100% of the outstanding common capital stock of KPSI from 1972 until these shares were sold to Dwayne A. House on February 28, 1979. The purchase and sale agreement was executed on January 31, 1979.
On September 11,1975 GECO pledged all of its stock in KPSI to the First National Bank of Chicago to secure a $7,500,000 line of credit. However, GECO is not authorized to do business in Illinois, and has no offices or property there. It also has no employees or agents in Illinois.
The certificate evidencing the ownership of the 10,000 shares of the capital stock of KPSI was continuously located outside Louisiana after the date of its pledge to the Illinois bank.
KPSI was financed by GECO’s borrowing $1,000,000.00 from First National Bank of Commerce in New Orleans, Louisiana and an additional $1,000,000.00 loan from *219 GM/DDA. The $1,000,000.00 loan from First National Bank of Commerce was contributed to KPSI in exchange for 10,000 shares of stock.
The same persons who served as officers and directors of GECO also served in KPSI. In addition KPSI used GECO for (1) financing; (2) inventory and parts management and control; (3) electronic data processing, including inventory and payroll until sometime after September 1975 when the payroll function had been completely transferred to KPSI. Billing (invoicing) had been transferred to KPSI prior to 1975.
Mr. Smith and Mr. H.F. Colby, who was Vice-President of KPSI and Executive Vice-President of GECO, visited the KPSI facility on an average of once a month and twice a month, respectively. Other GECO employees visited the KPSI location on an “as needed” basis.
James A. Cobb, Executive Vice-President of KPSI and Vice-President of GECO was paid by GECO.
From 1972 until the date KPSI stock was sold, KPSI was always indebted to GECO for working capital. In addition, at all times pertinent GECO charged KPSI a maintenance fee for common offices, salaries and other benefits; for electronic data processing services; interest on intercom-pany loans (at the same interest rate GECO was paying a bank); and for all other services, such as preparation of engines, at cost.
GECO loaned money to KPSI from 1972 to 1979. Furthermore, from 1972 to 1974 or 1975 GECO prepared the payroll register and journal, created employee earnings records, cut the checks, and prepared employment tax returns for KPSI. From 1974 or 1975 until the sale of the stock in 1979, payroll checks for KPSI employees were cut in Miami.
Also made part of the record are GECO’s Louisiana Corporation Income Tax and Franchise Tax Returns for the years 1977-78, 78-79, and 79-80. On its returns for the years 1977 and 1978 GECO reported its stock as an asset located in Louisiana. However, on its 1979 Louisiana Income Tax Return, GECO did not report the gain of $2,793,110.00 from the sale of the KPSI stock. Instead, GECO reported the gain on its 1979 Florida Corporation Income Tax Return.
The State seeks $126,803.52 from GECO together with statutory interest thereon from May 15, 1980, until paid and attorney fees. The State contends that the gain is taxable in Louisiana pursuant to L.S.A.R.S. 47:243(A)(4).
After an adverse ruling from the trial court, appellant now specifies the following error:
That the trial court committed manifest and reversible error in failing to conclude that GECO had not proved by clear, convincing and unequivocal evidence that the shares of stock had acquired a business situs in a state other than Louisiana, and in dismissing the State’s suit.
The crucial issue in this case is whether GECO has met its burden of showing that the shares of KPSI stock acquired a “business situs” in Florida.
The pertinent statute is L.S.A.-R.S. 47:243(A)(4) which provides:
Items of gross allocable income shall be allocated directly to the states from which such items of income are derived, as follows:
(4) Other interest, dividends and profits from sales and exchanges of capital assets consisting of incorporeal property or rights shall be allocated to the state in which the securities or credits producing such income have their situs, which shall be at the business situs of such securities or credits if they have been so used in connection with the taxpayer’s business as to acquire a business situs, or, in the absence of such a business situs, shall be at the legal domicile of the taxpayer in the case of an individual or at the commercial domicile of the taxpayer in the case of a corporation ...
The “business situs” test was explained by the Louisiana Supreme Court in United Gas Corporation v. Fontenot, 241 La. 488, 129 So.2d 748 (1961) as follows:
*220 The location of property is commonly known in law as its ‘situs’. It may be said that in general, for purposes of due process within the meaning of the Fourteenth Amendment, it is necessary for a state to have jurisdiction over the property for it to be there subjected to taxation. In determining this taxation ‘jurisdiction’, or ‘situs’, two opposed considerations — place of ownership and place of property location — have, from the beginning, given rise to legal difficulties.
* * * * * *
Because of their very nature intangible assets and property rights have no physical location, even though represented by paper evidences such as stock certificates, being merely relationships between persons that the law recognizes by attaching to them certain sanctions enforceable in the courts [citation and footnote omitted], the problem of determining their ‘situs’, or the state having jurisdiction to tax them, has presented even more complex difficulties — particularly under rapidly changing economic and business conditions developing during this industrialized age ... However, because these intangibles do constitute valuable property rights and should, therefore, bear their just burden of the cost of government, a situs has been ascribed to them for taxation purposes through a fiction of the law that is easily traceable to the first part of the ancient Roman maxim ‘mobilia sequuntur per-sonam, immobilia sitúa’ (movable things, or movables, follow the person; immovable, their locality).
This meant, simply, that tangible, or movable, property was regarded as being located at the legal domicile of the owner for the purpose of applying the law of that place to it in many situations, of which taxation was but one, although the property might, actually, be located elsewhere. From the standpoint of taxation, this fiction as originally applied permitted the state of the owner’s legal domicile to impose a tax on his personalty wherever located under the theory it had jurisdiction over such property because it had there acquired a ‘situs’ since it followed the owner and was, consequently, attached to his person at his legal domicile.
However, the application of this fiction by the courts to the taxation of tangible personalty was not unassailable, and, being a court made rule designed to work out practical justice, where the reason for its existence no longer obtained and it became evident the facts of the case could not justify a strict adherence thereto, there was a deviation or departure from its application, as, for example, where the facts showed the location of the personalty had such permanence in another state it was regarded as a part of the property of that state, which alone had jurisdiction over it, physical location and permanency being the determinative features that led to the development of the exception to the mobilia rule that permitted a state other than the legal domicile of the owner to tax the tangible property in the foreign state, [citations omitted.] The theory underlying this exception in so far as it concerned tangible personal property meant, essentially, that the benefit and protection of the laws enabling the owner to enjoy the fruits of his ownership was restricted to the state in whose territory the physical property was located; in other words, he was protected in his ownership and enjoyment of the tangible by the state where it was located to a greater degree than by the state of his domicile [citations omitted.]
This concept found its way into most legal systems, including the common law, and these courts, in an analogous but much later development, classifying intangible assets and interests in the same category as tangible movables, have traditionally, under the mobilia maxim, held their situs to be the domicile of the owner of the intangible and usually taxable there, unless there existed a specific law to the contrary. Thus, under this fiction, identification and association in the mind of intangibles with their owners (as in the case of movable tangibles and personalty) gave them, in the law, a ‘si- *221 tus’ at the legal domicile of the owner. [Emphasis in original.]
Because during the early years of their history the separate legal entities known as corporations generally maintained their principal place of business and operated almost exclusively within the confines of the state of incorporation, benefiting there, more so than in any other state, from the functions and protection of government, particularly with respect to intangible interests, the courts transferred the mobilia fiction that the situs of the intangible is the domicile of the owner to the corporate body — considered to be, in actuality, an artificially created invisible and intangible being, yet a person in contemplation of law — and applying to the intangibles of such legal entities the mobilia maxim, held thereunder their situs, as in the case of individuals, to be the legal domicile of the corporation — for taxation purposes.
* * * * * *
In time the courts, aware that the confinement of the domicile of such corporations within the boundaries of the incorporating state had become an anachronism ... and mindful of the fact that the formalistic and arbitrary application of the fictional mobilia rule to the taxation of the intangible interests of such corporations was denying to other states— where they had ‘taken up a home’ [footnote omitted] and in which these entities with respect to such intangibles were actually, and to a greater extent, benefiting from the functions and protection of government — their fair and constitutional share of the tax burden, began to look into the ‘realities’ of each situation, as they had with respect to the tangible personalty and movables as above mentioned, and to either apply or disregard the rule wherever the facts of the case so warranted, permitting taxation of intangibles by the state where they were being employed in such a way as to permit the owners to benefit from the protection of its laws in the enjoyment of the fruits from such interest ...
Out of these cases grew the exception to the rule that the incorporating state as the legal domicile could alone tax intangible interest of such entities that permitted a state — in which a foreign corporation engaged in activities in connection with its intangibles there in such a way as to bring them under the protection of that state more so than that of the incorporating state — to tax these intangibles on the theory they had acquired in the foreign state what is termed a ‘business situs’, physical evidences of the presence of these intangibles within the state not being a prerequisite, as had been the case in the deviation from the mobilia rule with respect to tangible personalty permanently located in a state other than that of the owner’s domicile. [Emphasis added.]
******
Primarily this exception was developed to allow the non-domieiliary state where the owner was there engaging in activities with respect to the intangibles with the view to profit outside the legal domicile, or, as sometimes characterized, as having there ‘become an integral part’ of a local business, [footnote omitted] to tax these interests on the basis of the benefit and protection there conferred, as in the case of the exception to the mobilia rule as developed with respect to tangible property. [Emphasis added]. 129 So.2d 748 at 752-55.
Furthermore, in interpreting L.S.A.-R.S. 47:243, the United Gas court held that:
all of the gross income from the intangible assets of a nonresident individual or a foreign corporation deemed to be earned within or derived from sources within Louisiana is allocated to the legal domicile of the former and the ‘commercial domicile’ of the latter unless (a) it is interest on the notes and accounts of customers located in other states, or (b) other interest dividends, and profits derived from securities or credits having a ‘business situs’ in another state, in which events, the gross income from such source is allocated to these respective states. Id. at 769.
*222 Therefore, the Louisiana Supreme Court has construed the “business situs” rule provided in L.S.A.-R.S. 47:243 as an exception to rule allocating profits from intangibles to be allocated at the commercial domicile of the corporation taxpayer. See also Pelto Oil Company v. Collector of Revenue, 384 So.2d 533 (La.App. 4th Cir.1980).
Appellant argues that GECO in seeking an exception through the “business situs” rule is requesting an exemption. Thus, the state contends that GECO’s standard of proof should be the clear, unequivocal and affirmative standard required for exemptions. See, e.g. Vulcan Foundry, Inc. v. McNamara, 414 So.2d 1193 (La.1981).
We need not address the issue of the proper burden of proof since we find that even applying the lower burden of proof, the preponderance of the evidence, the trial court’s conclusion that GECO met its burden of proof is clearly wrong and manifestly erroneous.
In order for the gain on GECO’s stock to be taxable in Florida, this asset must have acquired a “business situs” there. According to United Gas, supra the KPSI stock would have had to become an integral part of the KPSI business.
In his reasons for judgment the trial court stated:
The issue before the court is whether or not the shares of capital stock of Key Power Systems, Inc. (KPSI), a Florida Corporation, owned by defendant taxpayer [GECO] acquired a ‘business situs’ in Louisiana or in a state other than Louisiana. After considering the evidence presented at trial and the memorandums [sic] submitted, the court concludes that Louisiana did not have the requisite integral connection with the taxpayer’s [GECO’s] business as to acquire a ‘business situs’ in Louisiana.
The trial judge misapplied the test to the facts. He concluded that “Louisiana did not have the requisite integral connection with [GECO’s] business as to acquire a ‘business situs’ in Louisiana.” There is no question that GECO had its legal domicile in Louisiana and therefore has a definite connection with Louisiana.
In addition, the trial judge concluded that there had been a merger of the identities of GECO and KPSI; that GECO “was involved with daily functions of KPSI” and that GECO provided KPSI with such things as “financing, inventory, management, and working capital.”
The trial court’s finding that there had been a merger of corporate identities is clearly wrong. The franchise agreement entered into by GECO with GM/DDA precluded GECO’s doing anything other than forming a subsidiary corporation. Moreover, the evidence establishes that GECO and KPSI were two separate entities.
Furthermore, although GECO provided financing to KPSI, it loaned KPSI money at the same rate which GECO paid its bank. In addition, GECO charged KPSI a maintenance fee for common offices. It also charged KPSI other services at cost. Visits to the KPSI facility were only made either once or twice a month by GECO's executive Vice-President and on an “as needed” basis by other GECO employees.
During oral argument, GECO’s counsel noted that it is not necessary that there be a merger of the two corporations in order to show that the KPSI stock was an integral part of the KPSI business in Florida. He contends that the loan proceeds from the pledge of the KPSI stock were used to finance the Florida coloration and that the financing was an integral part of the KPSI business.
It is clear however that GECO’s ownership interest in the KPSI stock was never transferred to KPSI. GECO owned the stock and only pledged it. When GECO pledged the stock to secure a line of credit, the pledge did not change either the ownership of the stock or the nature of this asset. L.S.A.-C.C. Art. 3166. L.S.A.-C.C. Art. 3166 provides:
Until the debtor be divested from his property (if it is the case), he remains the proprietor of the pledge, which is in the hands of the creditor only as a deposit to secure his privilege on it.
See also, Colonial Bank v. Pier Five, Inc., 469 So.2d 1029 (La.App. 4th Cir.1985), writ denied 475 So.2d 363 (La.1985); Louisiana *223 Nat. Bank of Baton Rouge v. O’Brien, 439 So.2d 552 (La.App. 1st Cir.1983), writ denied 443 So.2d 590 (La.1983); Emile M. Babst Co., Inc. v. Commercial Enterprises, Inc., 274 So.2d 742 (La.App. 4th Cir. 1973), writ denied 277 So.2d 673 (La.1973); Scott v. Corkern, 231 La. 368, 91 So.2d 569 (1957).
GECO never gave the shares of stock to KPSI in order for KPSI to pledge them. Instead, GECO retained the ownership and control of the stock. The fact that some of the loan proceeds may have gone to KPSI is of no moment. Only the loan proceeds may have gone to KPSI — not the shares. While some of the loan proceeds became an integral part of the KPSI business, the stock did not. Ownership and control of the stock remained in GECO, a Louisiana corporation. Thus, the gain from the sale of GECO’s stock is properly taxable at the place of GECO’s commercial domicile; namely, Louisiana.
This case also raises another consideration. On one hand GECO is seeking to avoid breaching its franchise agreement with GM/DDA by establishing KPSI as a separate and independent entity and yet to urge that GECO and KPSI are merged as a single entity for taxation purposes.
Additionally, an analogy can be drawn from Crabtree Investments, Inc. v. Aztec Enterprises, Inc., 479 F.Supp. 448 (M.D. La.1979) when the court held:
We have found no authority and plaintiffs have cited none which would support the proposition that a sole shareholder may ignore the corporate entity when it suits his convenience. Id. at 451.
As noted above, GECO reported its stock, which included the KPSI stock, as an asset located in Louisiana on its income tax and franchise returns for 1977 and 1978. In addition the stock was reported on GECO’s Louisiana return at the beginning of 1979. However, at the end of 1979, the taxable gain from the sale of the stock was not included.
We are not persuaded by GECO’s argument that it included the KPSI stock on the Louisiana return because it owned the stock and that when the stock was sold, it no longer owned it. In lieu of the stock, it now owns $2,793,110.00 from its sale.
While we do not address GECO's argument that the mere inclusion of the KPSI stock on its Louisiana return is not tantamount to an admission that the gain from its sale is taxable in Louisiana, we do note with approval the public policy rationale given by the court in Maplewood Housing Corporation v. Fontenot, 238 La. 378, 115 So.2d 386 (1959). The Fontenot court considered a taxpayer’s change in the value of some assets for franchise tax purposes. In refusing to allow the taxpayer to decrease the values it had previously placed on the assets the court reasoned:
if a taxpayer could revise the value of assets back and forth and without limitation, his tax liability would constantly be fluid, thus prohibiting a fixed and effective audit for tax purposes resulting in an avoidance of responsive tax liability. Id. 115 So.2d at 389.
It is of no moment whether GECO was taxed on its gain in Florida. Its tax consequences are irrelevant to the issue at bar. The issue is whether the KPSI stock owned by GECO was used in Florida so as to become an integral part of the KPSI business. United Gas, supra; L.S.A.-R.S. 47:243(A)(4).
Finding manifest error, we reverse the trial court’s judgment and decree that judgment be granted in favor of the State and against GECO.
ATTORNEY FEES:
It was stipulated that the State retained private counsel for this suit. Therefore, pursuant to L.S.A.-R.S. 47:1512[1] the State is entitled to reasonable attorney fees. City of Baton Rouge v. Stauffer Chemical, 500 So.2d 397 (La.1987).
*224 The parties also stipulated that “If judgment is rendered herein in favor of plaintiff, the judgment should be for the amount prayed for in plaintiffs petition, as amended.” The state however prayed for 10% attorney fees in accordance with L.S.A.-R. S. 47:1512. The Stauffer Chemical court held at 401:
that portion of La.R.S. 47:1512 ... attempts to regulate attorney fees. The prohibition against a lawyer accepting a ‘clearly excessive fee’ cannot be abrogated by a law fixing the amount of attorney fees as a percentage of the amount to be collected. Despite such a law, the courts may inquire into the reasonableness of such a fee. [L.S.A.-R.S. 47:1512 does] not per se conflict with this court’s exclusive constitutional authority to regulate the practice of law in this state. It is only when the attorney fees fixed pursuant to these laws are excessive and unreasonable that the laws conflict with the limitations set forth in Disciplinary Rule 2-106. Therefore, [L.S.A.-R.S. 47:1512 is] not unconstitutional. Rather [it is] subject to judicial scrutiny on a case by case basis regarding whether the attorney fees as mandated by law are reasonable and not excessive under the circumstances.
Since the trial court heard no testimony relative to this issue, the record is devoid of any information regarding the fees incurred. We therefore remand to the trial court to set reasonable attorney fees. See Lutz v. Jefferson Parish School Board, 503 So.2d 106 (La.App. 5th Cir.1987).
For the reasons stated, the judgment of the trial court is reversed and judgment is now rendered in favor of the State and against GECO for $126,803.52, plus interest thereon as provided by law from May 15, 1980 until paid, plus reasonable attorney fees and costs.
REVERSED AND RENDERED; REMANDED.

. L.S.A.-R.S. 47:1512 provides:
The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Subtitle, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten percentum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor.