SAMUEL, Judge.
Plaintiffs in these consolidated suits appeal from a judgment of the Civil District Court for the Parish of Orleans upholding a decision of the Board of Tax Appeals for the State of Louisiana which held certain certificates of deposit and United States Government securities did not obtain a business situs and that the commercial domicile of Pelto Oil Company was the State of Louisiana rather than the State of Texas, thereby making these securities subject to Louisiana income and franchise taxes.
Incorporeal property or rights and the income derived from them are allocated by R.S. 47:243 A(4) and R.S. 47:606 A(l)(h) and (2)(b) to the state in which the business situs of the incorporeal property is located or, in the absence of a business situs, to the commercial domicile of the corporate tax payer. Both Pelto and Southdown, Inc. contend Pelto’s commercial domicile during the years in question was Houston, Texas and not New Orleans, Louisiana. The Collector of Revenue, on the other hand, maintains the securities did not acquire a business situs outside Louisiana and Pelto maintained its commercial domicile in Louisiana.
Pelto Oil Company was a division of Southdown, Inc. prior to its organization as a Delaware corporation in 1969. Pelto was qualified to do business in Texas, Alabama, Mississippi, and Louisiana. After its liquidation in September, 1974 it again did business as a division of Southdown, Inc.
Southdown, a Louisiana corporation, owned all the outstanding stock of Pelto during most of 1971. For the remainder of 1971 and during 1972,1973, and 1974 South-down owned 56% of the outstanding common shares by value of Pelto and 83% of Pelto’s voting power. During these years, Pelto filed consolidated federal income tax returns with Southdown.[1]
In somewhat oversimplified terms, R.S. 47:243 provides that, for income tax purposes, interest income shall be allocable to the state in which securities producing such income have their business situs. If the securities have not been used so as to establish a business situs, the commercial domicile of the taxpayer determines the state in which the interest income is taxable.
*535 The “commercial domicile” of the owner of these securities is likewise a factor in determining the Louisiana franchise tax. Revised Statute 47:606 A establishes a franchise tax base allocable to Louisiana and provides that the revenue factor (Louisiana revenue as a proportion of total revenue) is determined by allocating interest to Louisiana when the securities producing the interest have a business situs in Louisiana; if a business situs for the securities cannot be found the interest income allocable to Louisiana is taxed to the taxpayer if its commercial domicile is in Louisiana. Revised Statute 47:606 further provides that the property factor for determining franchise tax (Louisiana assets as a proportion of total assets) includes securities as Louisiana assets if they have established a business situs in Louisiana or, in the absence of a business situs, the taxpayer’s commercial domicile is in Louisiana.
Southdown, the parent corporation of Pelto, has an interest in this proceeding because the franchise tax it pays will depend on the taxable base in Louisiana of Pelto Oil Company. The proposed reallocation to Louisiana of Pelto’s securities and their income would increase Southdown’s franchise tax, since that tax is measured in part by the value of its investment in the Pelto stock.
Appellants rely on the following facts to establish the incorrectness of the Collector’s proposed assessment: During the years in question, four of the eight Pelto officers, including its chairman and chief executive officer, worked in Pelto’s office in Houston.[2] All Pelto’s annual stockholders’ meetings were held in Houston. Approximately two-thirds of its board of directors’ meetings were held in Houston, and only one-third in New Orleans. The purpose of the New Orleans board meetings was solely to review Pelto’s drilling operations and pending business prospects, “and not to make significant management decisions.” Sixty to eighty-five percent of the wells and leases owned by Pelto were located outside Louisiana.
The Pelto officers in Houston expended approximately twenty-five percent of their time performing services for Pelto under a management contract between it and Southdown. A management fee was paid by Pelto to Southdown of $10,000 per month plus reimbursement of all direct expenses incurred by Southdown. The management fee was used to cover salaries of Pelto officers and Southdown clerical personnel performing services for both South-down. and Pelto. Annual budgets and annual profit plans were initiated by the New Orleans employees and submitted to the Houston office for approval or adjustment, and variances from budgets and profit plans were explained monthly in written reports to the Houston office. The officers in Houston were compensated by Pelto indirectly through the $10,000 per month management fee paid Southdown.[3] In addition, during 1974 Pelto directly paid its chairman and chief executive officer remuneration of $172,500, paid its vice president and assistant to the chairman $47,920, and paid its vice president of finance $24,608. The chairman and chief executive officer of Pel-to in Houston set budget guidelines for Pelto for capital spending in various geographical areas and established the method for its raising capital. Pelto’s business in Houston was not one which required contact with the general public, so it was not necessary to conduct business in Houston for Pelto to have a separate telephone listing or an office separate from the South-down offices, because all of Pelto’s customers knew Pelto could be contacted at the Houston office of Southdown.
Pelto’s annual reports to shareholders showed two offices for the corporation, one in Houston and one in New Orleans. These annual reports were prepared with the assistance of Houston legal counsel only, *536 without aid from Louisiana legal counsel. Pelto’s president, located in New Orleans, consulted frequently with the Houston based chairman and chief executive officer on various business decisions necessary in Pelto’s business. He contacted the chief executive officer by telephone at a minimum of once a week, usually on a daily basis, and frequently several times a day. These two gentlemen consulted on various management decisions and did not restrict their consultations solely to broad policy decisions with respect to Pelto’s operations. Because of the experience of the chief executive officer in Houston, he was able to make business decisions for Pelto on a daily basis, and the Houston office made all top-level management decisions for the corporation.
All decisions regarding possible corporate acquisitions by Pelto were made in Houston, and all negotiations were handled by the Houston office with the assistance of Houston legal counsel only. Louisiana counsel were involved in negotiations only to the extent needed to answer questions on Louisiana law and to render real estate title opinions. The Houston officers made all the decisions relating to taking Pelto public in 1971, with no New Orleans employees being involved in the making of this decision.
In 1971, approximately $23,000,000 in certificates of deposit in United States Government securities was invested by Pelto, and no portion of these funds was invested in interest-bearing accounts of banks or other issuers located in Louisiana. The Houston office initially invested these funds and later the secretary-treasurer in New Orleans was told by the Houston office where these funds were invested in 1971 and the allocation of these funds among bank certificates of deposit and United States Government securities. The New Orleans based secretary-treasurer was instructed to reinvest the proceeds of certificates of deposit when they matured into identical certificates of the same issuer unless he was directed by the Houston office to reinvest those proceeds in other investments determined by the Houston office. At no time was the secretary-treasurer’s opinion sought as to where the proceeds should be reinvested, and the Houston officers completely controlled these investments. The New Orleans officer was only used to convey the Houston officer’s instructions so he could keep proper accounting records of the investments.
All certificates of deposit owned by Pelto were physically kept by the issuing bank, and the government securities were kept by an investment firm in Houston. The Houston officers often directed the secretary-treasurer in New Orleans to invest certificates of deposit in certain banks to establish good banking relationships for either Pelto or other Southdown subsidiaries. Such investments were made in Continental Illinois National Bank, Wells-Fargo National Bank, and Valley Bank of Nevada. No officers of Pelto in New Orleans were ever consulted regarding the type of investments to be made or the issuing banks from which certificates of deposit were to be purchased. Pelto filed Louisiana, Delaware, Mississippi, and Texas franchise tax returns. However, under Texas franchise tax law, these certificates were excluded from the Texas franchise tax base because of the particular provisions of Texas law.[4]
We conclude that the foregoing facts do not support the position of Pelto and South-down, and we conclude that both the Board of Tax Appeals and the Civil District Court for the Parish of Orleans were correct in maintaining the proposed assessment by the Collector of Revenue.
The statutory rules mentioned above determine whether incorporeal moveables and their income should be attributable to Louisiana for the calculation of income and franchise taxes. These rules were explained by the Louisiana Supreme Court, as they apply to income taxes, in United States Gas Corporation v. Fontenot.[5] That *537 court stated if the income is from securities or credits that have acquired a “business situs” in another state, then that income is allocated to the state of “business situs”. If no such “business situs” has been established in another state, then the income in the case of a corporation is allocated to the state where the corporation has its “commercial domicile”. Since the statutory rules are basically the same for income and franchise taxes, the Fontenot decision can be said to apply to both.
In the present case, it is evident the securities have not established a “business situs” either in or outside Louisiana. The Supreme Court in the Fontenot case defined business situs as follows:
“. . .if the intangibles are used in another state in such a way as to there ‘become an integral part’ of a business carried on within the foreign state, that state, may tax such intangibles on the basis of a ‘business situs’ acquired there.”
Thus, the essential elements for establishing a “business situs” for incorporeal moveables is that they become an integral part of the business of the owner. Even the facts relied upon by Pelto and Southdown establish the deposits were used primarily for the establishment of the banking goodwill of Southdown and not Pelto. Moreover, the deposits were not bound permanently to any bank by formal agreement or otherwise; they were in fact shifted from place to place at will.
The Board of Tax Appeals made the following conclusion with regard to the business situs of the securities;
“The securities in question do not obtain a ‘business’ situs of their own because the evidence did not show that they obtained enough open ‘localization’ and were not an integral part of an independent business in a state other than Louisiana.” [6]
The Collector correctly argues the deposits in question were not an integral part of the business of Pelto in Texas or in any other state, nor were they localized in any other state. Consequently, they could not and did not acquire any business situs whatever. The taxability of these securities in Louisiana depends of necessity on whether or not Pelto, a Delaware corporation, had its “commercial domicile” in Louisiana. If it did, both the assets and their income may be allocated to Louisiana under the above cited statutes to calculate both Louisiana income and franchise tax.
The concept of using commercial domicile rather than legal domicile as a situs of intangibles (not possessing a situs elsewhere) for tax purposes was sanctioned in the landmark case of Wheeling Steel Corporation v. Fox.[7] In that case the United States Supreme Court found the commercial domicile of Wheeling Steel to be in the state of West Virginia even though 80% of its expenditures were made outside West Virginia and its principal manufacturing plants were located in Ohio. The basic holding of the court in justification for allowing the state of West Virginia to impose tax on the intangibles was that the general business offices of the corporation were located in Wheeling, West Virginia, where the officers of the corporation resided.
The leading Louisiana case regarding commercial domicile is North Baton Rouge Dev. Co., Inc. v. Collector of Rev.[8] In that case North Baton Rouge Development was a Delaware corporation which became dormant following a period of buying and developing land for industrial and railway sites. By 1962 the major portion of North Baton Rouge Development’s assets were investments in stocks, which were exclusively managed and controlled by its board of directors and other persons located in the State of Missouri. The court cited the definition of “commercial domicile” from Unit *538 ed Gas Corporation v. Fontenot,[9] as controlling:
“In other words, the ‘commercial domicile’ exists where the principal place of business is located and from which the corporation’s activities function and are managed.”[10]
The court in North Baton Rouge Development chose to ignore the control of the incorporeal moveables in question because merely holding investment was not “doing business”. It ignored evidence that the company’s Louisiana personnel made no decisions concerning the investment, and instead concentrated on “. . . the nature of the management process for North Baton Rouge Development Company in its primary function — the development of Louisiana industrial sites designed to benefit railroad.” In effect, the Supreme Court did not look to management process in Louisiana, but instead chose to rely on other “physical indicia” as follows:
“The only business done by North Baton Rouge Development Company is in Louisiana. It is here that it has developed industrial railway sites. The record does not show that any of its assets are located outside the State of Louisiana except the securities here involved. Its only employees are in Louisiana. Its only office is in Louisiana. Its president is in Louisiana. If North Baton Rouge Development Company can be said to have a commercial domicile in any place, it is in Louisiana and Louisiana alone.”[11]
The court in the above quotation clearly relied upon the location of the company’s “only office” in Louisiana, the fact that its president and other employees resided and carried on its business there, and that its only employees were located there.
From other cases it is clear that mere control, or the right to control, from another state does not determine commercial domicile. In United Gas Corporation v. Fontenot,[12] the Louisiana Supreme Court stated:
“From the foregoing it is obvious that the focal point of all of the business and operations and management and control of this corporation and its subsidiaries spread over this wide and vast area of the Southern portion of the United States— not to mention others, such as construction, budget, maintenance, research, public relations, sales promotion, employee relations, issuance of the annual report to stockholders, etc., with which it was necessarily integrated and which therefore formed an important part of its operations — was, in 1949, and for several years prior thereto, actually functioning from the headquarters of the corporation in the large United Gas Building in Shreveport, Louisiana, almost all of its officers, several directors, and a large staff of employees of the corporation and its subsidiaries living in Shreveport and working in this building. There is no question but that substantially all of the corporation’s activities were carried on in Louisiana, or that it was in Louisiana that its actual control was exercised and its management functioned, and that, certainly, more benefits were conferred upon this corporation by Louisiana than by any other state.”
The cases also indicate out-of-state formulation of policy and general influence of an out-of-state board of directors does not remove a commercial domicile from Louisiana. In Arkansas Fuel Oil Corp. v. Fontenot,[13] the Louisiana Supreme Court stated:
*539 “The point is strongly urged that none of plaintiff’s meetings of its board has ever been held in Louisiana; that during the years 1946,1947 and 1948, all of its board meetings as well as those of its subsidiaries were held in the City of New York and there the policies of the corporation were formulated. But the place where the board’s meetings were held would seem to be immaterial in fixing the situs where the intangibles of the corporation could be taxed unless the carrying out of its policies and the management of the corporation’s business were, in a large part, conducted at that same place.”
The following statement was made by the Board of Tax Appeals in its written reasons:
“The evidence shows that the ‘commercial domicile’ of Pelto as defined in the United States Supreme Court case of Wheeling Steel Corporation v. Stokes was the state of Louisiana and not Texas. The ‘commercial domicile’ will depend on the facts and circumstances of each case. In the cases at bar the principal place of business, the place where the corporation’s activities function and/or managed, the place ‘management functions’ is Louisiana. This is true even though it is evident that policy and possibly the highest level management decisions may have been made without the state. The state of Louisiana obviously furnished to Pelto the bulk of the governmental protection of that corporation.”
It is the opinion of this court that Pelto “functioned” and its business was managed and carried out in New Orleans. Pelto's principal business function is obtaining geological data and engaging in the production of oil and gas. This function was carried on in New Orleans and not in Houston. The only business office independent of and not part of its parent company was in New Orleans. It had no office available to the general public in Houston, no mailing address, and no listed telephone. Its books and records of day-to-day operations were kept in New Orleans, and there was no independent Pelto staff in Houston. Its secretarial, bookkeeping, leasing, geological, and engineering staff were all located in New Orleans. A functioning management controlling employees which kept books, made plans, prepared budgets, made sales, contracted for services, collected money, paid bills, salaries, and other obligations, existed in New Orleans under a president who conducted day-to-day operations. As urged by the Collector, we feel the New Orleans office was the “focal point” of Pel-to’s business.
To be sure, the personnel in Houston had some degree of influence over the affairs of New Orleans. However, the Houston personnel and board members came to New Orleans to be informed about current operations. This fact is significant because it was the staff at New Orleans which had the operational information on what business activities Pelto was doing, which obviously controlled the prospects for its profitability. Moreover, the influence exercised by the chairman of the board and chief executive officer of Pelto[14] was primarily focused upon controlling the deposits of the securities attempted to be taxed in this case. In the North Baton Rouge case, the court held direction of investment of corporate funds in securities is not the type of business activity which may establish commercial domicile. Throughout the record, the influence of the chairman of the board and chief executive officer of Pelto over its oil development and exploration activities is set forth in terms of suggestions, guidelines, prohibitions, policies, and similar phraseology. The president of Pelto did consult with the chief executive officer in Houston, and the latter sometimes exercised his power in routine business decisions. But even if the “high level management decisions” with Pelto were made by Southdown through common officers of Pelto, the detailed implementation and exercise of the policies were left as a matter of business to Pelto in New Orleans.
*540 The commercial domicile of a business cannot be at some remote location where an individual, or even two or three of the higher officers of a corporation, may be located, particularly if there is no office, staff, or other physical indicia of management functioning at that location. In the present case the officers of Pelto, being in actuality the officers of Southdown, and expending no more than 25% of their time with Pelto under a management contract, does not present a factual situation sufficient to establish a commercial domicile for Pelto in Houston at the location of its parent company.
Consequently, we hold the commercial domicile of Pelto was in New Orleans, and that the Collector correctly assessed income and corporate franchise taxes on the securities and the income derived therefrom which had not been afforded a business situs in any one particular location.
For the reasons assigned, the judgment appealed from is affirmed.

AFFIRMED.

. The Collector proposed assessments of Louisiana income tax against Pelto for 1971, 1972, 1973, and 1974 of $199,616.28 with interest to April 30, 1977 of $76,210.80, totaling $275,-827.08. For the same years, the Collector proposed franchise tax assessments against Pelto of $62,035.50 with interest to April 30, 1977 of $28,081.61, totaling $90,117.11. For the years 1972, 1973 and 1974, the Collector’s proposed assessments of franchise tax against South-down was $17,688.50, with interest to April 30, 1977 of $8,083.52, totaling $25,772.02.

. However, the Houston office was not separately identifiable, was not listed in the telephone directory, and did not have its own separate address.

. It is not clear whether this $10,000 management fee completely compensated Southdown for services rendered on behalf of Pelto by the officers in Houston.

. See Humble Oil & Refining Company v. Calvert, (Tex.), 414 S.W.2d 172.

. 241 La. 488, 515, 129 So.2d 748, 758.

.See North Baton Rouge Dev. Co., Inc. v. Collector of Rev., La.App., 294 So.2d 571, in which the court found no business situs anywhere for the various stock involved in the case.

. 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143.

. La., 304 So.2d 293.

. 241 La. 488, 509, 129 So.2d 748, 756, supra, note 5.

. The Louisiana Supreme Court in North Baton Rouge Development Company also noted approvingly the United States Supreme Court’s holding in Wheeling Steel Corporation v. Fox, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143, supra, note 7.

. La., 304 So.2d 293, 298.

. 241 La. 488, 560, 129 So.2d 748, 774, supra, note 5.

. 225 La. 166, 181, 72 So.2d 465, 470-471.

. The chairman of the board of Pelto was also the chairman of the board of Southdown, Inc.