**ASSOCIATED PARTNERSHIP I, INC., Plaintiff–Appellant,**

v.

**Joe B. HUDDLESTON, Commissioner of Revenue, State of Tennessee, Defendant–Appellee.**

Supreme Court of Tennessee, at Nashville.

Oct. 17, 1994.

Rehearing Denied Dec. 12, 1994.

**192** ■

James C. Gooch, Michael D. Sontag, Bass, Barry & Sims, Nashville, Kevin R. Conzelmann, John P. Oswald, Lord Day & Lord, Barrett Smith, New York City, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, William E. Young, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

ANDERSON, Justice.

In this direct tax appeal, the Chancellor held that the capital gain realized from the sale of a partnership interest by the taxpayer was classified as "business earnings."[1] Because we conclude that the capital gain did not arise from a transaction in the regular course of the taxpayer's business, we hold the gain was "nonbusiness earnings." We, therefore, reverse the Chancellor's judgment, which denied a full refund of corporate excise taxes.

We also hold that the commercial domicile of the taxpayer was not in Tennessee and

that, therefore, the nonbusiness earnings are not allocable to Tennessee and not taxable.

## FACTUAL BACKGROUND

Daily Mail and General Trust, plc ("Daily Mail"), is a publicly owned corporation based in London, England, which serves as a holding company for various publishing and media concerns. The principal business activity of the Daily Mail group of corporations is the provision of information through public media, including the publication and printing of newspapers and periodicals. The "flagship" publication of the Daily Mail group is the *London Daily Mail*, which is the largest newspaper, by circulation, in the United Kingdom. The principal officers of Daily Mail are Charles Sinclair, who is the Chief Executive Officer and a resident of London, England, and Lord Rothermere, who is the chairman, the principal shareholder, and a resident of Paris, France.

In 1979, Daily Mail began investing in publishing businesses that were managed by Christopher Whittle and headquartered in Knoxville, Tennessee. Daily Mail's investment was in stock in the 13–30 Group, a corporation which was the holding company for Whittle's publishing company, 13–30 Corporation.

Between 1979 and 1986, Daily Mail's investments in 13–30 Group continually increased. With each additional investment, Daily Mail acquired a larger share of the business, so that, by 1986, Whittle and his key employees had only a very limited economic stake in the publishing business. To provide an economic incentive for Whittle and his associates who were conducting the day-to-day operations, Whittle and Sinclair agreed on a restructuring of the business in 1986. To carry out the restructuring plan, Daily Mail established two Delaware corporations known as Associated Partnership I ("AP I") and Associated Partnership II ("AP II"). Whittle's holding company, 13–30 Group, was merged into AP I; and his pub-

1. "*b*... (1) 'Business earnings' means earnings arising from transactions and activity in the regular course of the taxpayer's trade or business and includes earnings from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations;...." Tenn.Code Ann. § 67-4-804(a)(1) (1989 & Supp.1992). The statutory definition has been rewritten during the pendency of this cause. *See* Tenn.Code Ann. § 67-4-804(a)(1) (Supp.1993).

lishing company, 13–30 Corporation, was merged into AP II. Whittle Communications LP ("WCLP"), a Delaware limited partnership, was established as a part of this restructuring. AP II then became a general partner in WCLP, along with Whittle Communications, Inc. ("WCI"), a Tennessee corporation controlled by Whittle. The limited partners of WCLP were management employees in the publishing businesses. WCLP was capitalized by AP II's contribution of 141 million dollars, as well as the contribution of the other general partner, WCI, of 2.25 million dollars. The limited partners made only nominal capital contributions.

In recognition of the fact that AP II had contributed substantially all of the capital to the new partnership, and to ensure that Whittle and his managers had an economic incentive to make the publishing businesses as profitable as possible, WCLP's limited partnership agreement contained profit allocation provisions granting AP II a preferential return on its capital from the profits of the business. Any profits above the amounts required to give AP II its preferential return were allocated among the partners in accordance with percentages that varied depending on the profit levels attained.

The partnership agreement, through WCI, specifically vested exclusive authority for day-to-day operations in Whittle. WCI had sole and exclusive authority to hire and fire employees, conduct WCLP's product development, acquire additional assets (within certain guidelines), arrange for borrowings on a non-recourse basis, and to execute all routine contracts and documents deemed necessary and appropriate.

AP II's principal, in fact only, business activity was holding the general partnership interest in WCLP. The directors of AP II resided outside the United States, but, on a regular basis, traveled to New York to attend partnership meetings for WCLP. The directors included Lord Rothermere, Sinclair, and Peter Saunders, a resident of London, England. Although AP II's involvement in the day-to-day business of the partnership was limited to major issues such as borrowing on a recourse basis and the sale of WCLP assets in excess of certain limits, the AP II directors were actively involved in activities which required the consent of all the partners. For example, the decisions to locate WCLP's corporate headquarters in Knoxville, and to construct a new facility to house the headquarters were made only after the directors of AP II persuaded Whittle that knowledgeable personnel necessary to the publishing business would relocate to Knoxville. Only then did the partners unanimously agree to proceed with the financing arrangement for the project. AP II consulted with their own independent legal and financial advisors in New York and London before agreeing to these proposals.

Sinclair and Saunders were also the only managing officers of AP II. Sinclair was primarily responsible for management decisions. Sharon Draper, a resident of Knoxville and a full-time employee of WCLP, held the title of Chief Accounting Officer for AP II, but she performed only bookkeeping functions in regard to the bank account that AP II maintained in Tennessee to receive distributions from the partnership, and she received no compensation. Her appointment was to avoid any administrative inconvenience that might result from the six-hour time difference between London and East Tennessee. She never attended a partnership meeting, nor did she attend any meeting of the officers and directors of AP II which were all held outside of Tennessee, in either London, New York, Montreal, or Paris. All of the decisions concerning the management and investment policy of AP II were made and implemented at these meetings outside Tennessee. In addition, AP II's corporate advisers, including lawyers, accountants, and investment bankers, were located in New York and London, and all of the corporate books and records were maintained in New York. AP II never maintained an office in Tennessee, and its directors and managing officers never once came to Tennessee on AP II business, or otherwise, during the entire time of AP II's corporate existence. Throughout its existence, the only assets owned by AP II were its interest as a general partner in WCLP, and the bank account in Knoxville set up to receive partnership distributions.

The operations of WCLP were highly successful. In 1988, however, Whittle decided he wanted to sell the business in order to insure his own personal financial security and liquidity. Time, Inc., ("Time") was interested in buying, but AP II was reluctant to sell because Sinclair believed, that over the long term, the investment would produce greater returns if AP II retained its partnership interest. However, because AP II considered Whittle vital to WCLP's continued success and because Whittle wanted to sell, AP II agreed. The transaction provided for Time to purchase, in 1988, one-half of the interests owned by all the partners of WCLP and the remaining partnership interests in 1993, if certain financial conditions were achieved.

AP II sold one-half of its interest to Time on December 12, 1988. Pursuant to the written agreement, AP II also merged into its parent corporation, AP I. This merger was, for federal income tax purposes and Tennessee excise tax purposes, a complete liquidation, terminating the corporate existence of AP II. Pursuant to the liquidation, the proceeds from the sale of AP II's partnership interest, a capital gain of $122,400,783 passed to AP I. Daily Mail used the sales proceeds to repurchase some of its publicly-traded stock.

AP I, as successor-in-interest to AP II, filed a Tennessee excise tax return seeking a refund of $4,688,045. The Tennessee Department of Revenue denied the refund claim and assessed additional corporate excise taxes in the amount of $2,656,001 on the basis that the capital gains generated from the sale of AP II's partnership interest produced "nonbusiness earnings" allocable to Tennessee as the "commercial domicile"[2] of AP II. AP I paid the additional assessment and filed a claim for refund, which was denied.

Thereafter, AP I commenced this litigation against the defendant, Commissioner of the Department of Revenue, seeking a refund of $7,816,632, plus statutory interest.

At trial, the Commissioner's primary position was that the capital gain realized from the sale of the partnership interest was business earnings taxable in Tennessee by apportionment. However, the Commissioner did not abandon his previous position, that the capital gain constituted "nonbusiness earnings" all of which should be allocated to Tennessee as the "commercial domicile" of AP II.

Following the trial, the Chancellor concluded that the gain realized by AP II on its sale of the partnership interest in WCLP constituted "business earnings," and awarded the taxpayer a refund in the amount of $2,121,443, rather than the total refund sought. Because the Chancellor concluded that the gain constituted business earnings, he did not decide the question of "commercial domicile." In addition, the judgment provided that the Commissioner was entitled to attorneys' fees and litigation expenses to be determined after the final disposition of this appeal. Tenn. Code Ann. § 67–1–1803(d) (1989 & Supp. 1992).

### *"BUSINESS EARNINGS" AND "NONBUSINESS EARNINGS"*

▮ The first issue for determination on appeal is whether the Chancellor correctly determined that the capital gain realized by AP II from the sale of its partnership interest in WCLP constituted "business earnings," as opposed to "nonbusiness earnings," for corporate excise tax purposes. Pursuant to Tenn.R.App.P. 13(d), our review of findings of fact is *de novo* upon the record of the Chancery Court, accompanied by a presumption of the correctness of the Chancellor's findings, unless the preponderance of the evidence is otherwise. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993); *Tenn–Tex Properties v. Brownell–Electro, Inc.,* 778 S.W.2d 423, 425 (Tenn. 1989). When the question on appeal is one of

---

**2.** "Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's *commercial domicile* is in this state." Tenn.Code Ann. § 67–4–810(c)(3) (1989) (emphasis added). "Commercial domicile means the principal place from which the trade or business of the taxpayer is directed or managed." Tenn.Code Ann. § 67–4–804(a)(2) (1989 & Supp.1992). A partnership interest is intangible personal property. *See Omnicon, Inc. v. King,* 688 S.W.2d 818 (Tenn.1985).

law, our scope of review is *de novo* with no presumption of correctness accompanying the Chancellor's conclusions of law. *Union Carbide Corp.*, 854 S.W.2d at 91.

■ Excise taxes are levied upon corporations for the privilege of doing business in this state. *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206, 208 (Tenn. 1992). Tennessee's excise tax on corporate earnings, codified at Tenn.Code Ann. §§ 67–4–801 to 67–4–822, was enacted in 1976 and derived from the Uniform Division of Income for Tax Purposes Act (UDITPA), a model act prepared by the National Conference of Commissioners on Uniform State Laws. *General Care Corp. v. Olsen*, 705 S.W.2d 642, 644 (Tenn.1986).

■ As enacted in Tennessee, the UDITPA essentially establishes two methods by which corporate income will be divided for excise tax purposes. These two methods are "apportionment" and "allocation," and the particular method by which corporate income is divided depends upon whether the income is classified as "business earnings" or "nonbusiness earnings." *General Care Corp. v. Olsen*, 705 S.W.2d at 644.

At the time this case was tried and, therefore, for purposes of this appeal, "business earnings" are defined as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business and includes earnings from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." Tenn.Code Ann. § 67–4–804(a)(1) (1989 & Supp.1992).[3] If income is classified as "business earnings," it is "apportioned" by using a three-factor formula that takes into account the corporation's payroll, property, and sales. *See* Tenn. Code Ann. § 67–4–811 (1989 & Supp.1993).

"Nonbusiness earnings," on the other hand, are defined as "all earnings other than business earnings." Tenn.Code Ann. § 67–4–804(a)(5) (1989 & Supp.1993). If income is classified as "nonbusiness earnings," it is "allocated" under Tenn.Code Ann. § 67–4–810 (1989).

■ In determining whether corporate income is "business earnings" or "nonbusiness earnings," this Court has adopted the "transactional test." *See General Care Corp. v. Olsen*, 705 S.W.2d at 644–48; *see also Union Carbide Corp.*, 854 S.W.2d at 92; *Federated Stores Realty, Inc.*, 852 S.W.2d at 209. Under the transactional test, which is rooted in the former definition of "business earnings" as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business," relevant considerations include the frequency and regularity of similar transactions, the former practices of the business, and the taxpayer's subsequent use of the income. *Union Carbide Corp.*, 854 S.W.2d at 92; *General Care Corp.*, 705 S.W.2d at 644. Thus, the controlling factor under the transactional test is the nature of the particular transaction giving rise to the income. *Id.*

Other jurisdictions, however, have applied what is referred to as the "functional test," and interpreted the statute to read, "business earnings include earnings from tangible and intangible property if the *property* constitutes an integral part of the taxpayer's regular trade or business operation." Such an interpretation ignores a substantial portion of the statutory language, and allows income from the sale of an asset to be characterized as business income if the asset was used in the trade or business and produced business income while it was owned by the taxpayer. *General Care Corp.*, 705 S.W.2d at 645. Under the functional test, the extraordinary na-

**3.** The statute was amended in 1993 to define "business earnings" as "earnings arising from transactions and activity in the regular course of the taxpayer's trade or business *or* earnings from tangible and intangible property if the acquisition, use, management or disposition of the property constitutes an integral part of the taxpayer's regular trade or business operations. In essence, earnings which arise from the conduct of the trade or trades or business operations of a tax-

payer are business earnings, and the taxpayer must show by clear and cogent evidence that particular earnings are classifiable as nonbusiness earnings. A taxpayer may have more than one (1) regular trade or business in determining whether income is business earnings...." Tenn. Code Ann. § 67–4–804(a)(1) (Supp.1993). Under the 1993 amendment, the capital gain at issue here clearly would have been taxable as business earnings.

ture or infrequence of a transaction is irrelevant, and therefore, no significance is attached to the fact that a transaction involves a liquidation. *Id.*

In *General Care*, we rejected "the Commissioner's position that the 'disposition' of property need not be within the scope of the taxpayer's regular business operations in order to give rise to business income" because we found it "contrary to the plain language of the statute." *Id.*, 705 S.W.2d at 646. Likewise, we rejected the argument "that income from the sale of property is to be considered business earnings if the property sold constituted an integral part of the taxpayer's business." *Id.*, 705 S.W.2d at 648; *see also Union Carbide Corp.*, 854 S.W.2d at 94; *Federated Stores Realty, Inc.*, 852 S.W.2d at 211. Accordingly, in determining whether the capital gain realized from the sale of AP II's partnership interest is business earnings, we apply the former statutory definition, also referred to as the transactional test, and consider the frequency and regularity of similar transactions, the former business practices, and the subsequent use of the gain.

In this case, AP II's sole business was holding and managing a partnership interest in WCLP. The only other asset it controlled during its existence was a bank account in Knoxville maintained for receiving distributions from WCLP. Prior to the liquidation, AP II had never sold or transferred an interest in any asset. The evidence in the record preponderates against the Chancellor's conclusion that AP II had continuously reduced its interest in WCLP. Apparently, the Chancellor based that finding on the partnership profit allocation provision, but the provision did not constitute a reduction of the interest of AP II. It was instead a method used to allocate profits in order to provide economic incentive to Whittle and the other key management employees. The 1988 transaction was not a frequent and reoccurring transaction. It contemplated, and resulted in, the complete cessation of business and the termination of AP II's corporate existence. It was contrary to former business practices, in that it was the only sale of any asset that occurred during AP II's corporate existence. Finally, AP II did not use the proceeds from the sale in its ongoing trade or business. In fact, there was no ongoing trade or business because AP II was liquidated as part of the same transaction, and ceased to exist as a corporation.

■ The Commissioner contends that in determining whether the gains were business or nonbusiness earnings, we should consider the activities of the group of related corporations under the common control of Daily Mail. However, business earnings are "earnings arising from transactions and activity in the regular course of *the taxpayer's trade or business*."[4] For Tennessee excise tax purposes, each corporation doing business in this state is required to compute its excise tax liability and to file excise tax returns on an individual basis, separate and apart from other corporations with which "the taxpayer" may be under common ownership or control. If the Commissioner is concerned that taxes are being evaded, he has the statutory power to require a group of related corporations to file a consolidated return[5], and to allocate income between them accordingly. In this case, the Commissioner did not choose to impose such a requirement.

Assuming, for the sake of argument, that the activities of the other Daily Mail corporations are relevant to the inquiry, the gain still does not constitute "business earnings." The Daily Mail group had never before sold a profitable publications business. Instead, the former practice was to retain those companies, and profit from their long-term success. Over the fifteen years preceding this transaction, the Daily Mail group had disposed of only five other profitable businesses, none of which were publishing concerns. Thus, the disposition of AP II's partnership interest was not a transaction which occurred frequently and regularly, and it was contrary to the former business practices and philosophy of Daily Mail. Moreover, Daily Mail did not use the proceeds in any of the ongoing businesses. The proceeds were instead used to repurchase some of its publicly-traded

---

4. Tenn.Code Ann. § 67–4–804(1) (1989 & Supp. 1992) (emphasis added).

5. Tenn.Code Ann. § 67–4–812(c)(1)(B) (1989).

stock. Accordingly, the capital gain realized from AP II's sale of the partnership interest did not constitute "business earnings" arising in the regular course of the trade or business, but are properly classified as "nonbusiness earnings." The judgment of the Chancellor is reversed. Having reached this decision, we must now determine if the nonbusiness earnings are allocable to Tennessee.

## COMMERCIAL DOMICILE

In Tennessee, "nonbusiness earnings" are allocated to Tennessee pursuant to the provisions of Tenn.Code Ann. § 67–4–810 (1989). For example, rents and royalties from real property located in this state are allocable to Tennessee. Likewise, capital gains from sales of real property located in Tennessee are allocable to this state. In addition, capital gains from sales of tangible personal property are allocable to Tennessee to the extent the property has a situs in Tennessee, and even if not sited here, may be taxed if the taxpayer's commercial domicile is here. *Id.*

Capital gains and losses from sales of intangible personal property, however, are allocable to this state only if the taxpayer's commercial domicile is in this state. Tenn. Code Ann. § 67–4–810(c)(3) (1989 & Supp. 1992). Because the taxpayer owned an interest in the partnership WCLP, and since an interest in a partnership is intangible personal property, we must determine if Tennessee was the taxpayer's commercial domicile. *Omnicon Inc. v. King*, 688 S.W.2d 818 (Tenn. 1985). "Commercial domicile" is defined as "the principal place from which the trade or business of the taxpayer is directed or managed." Tenn.Code Ann. § 67–4–804(a)(2) (1989 & Supp.1993). This definition is derived from the Uniform Division of Income for Tax Purposes Act ("UDITPA"), a model act prepared by the National Conference of Commissioners on Uniform State Laws.

The term, "commercial domicile," originated in the U.S. Supreme Court decision, *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143 (1936). There, West Virginia's attempt to collect property taxes upon the accounts receivable and bank deposits of a Delaware corporation was chal-

lenged on due process and equal protection grounds. In upholding imposition of the property taxes, the Court stated:

> The corporation established in West Virginia what has aptly been termed a "commercial domicile." It maintains its general business offices at Wheeling and there it keeps its books and accounting records. There its directors hold their meetings and its officers conduct the affairs of the corporation. There, as appellant's counsel well says, "The management functioned." The corporation has manufacturing plants and sales offices in other states. But what is done at those plants and offices is determined and controlled from the center of authority at Wheeling. The corporation has made that the actual seat of its corporate government.

*Id.*, 298 U.S. at 211–12, 56 S.Ct. at 778.

There are no Tennessee cases dealing with the UDITPA definition of "commercial domicile," and few cases from other jurisdictions. The Kansas Supreme Court interpreted the definition as referring to the location of the corporation's principal office from which its business affairs were directed. *Western Natural Gas Co. v. McDonald*, 202 Kan. 98, 446 P.2d 781 (1968). In that case a Delaware corporation was engaged in the oil business in Kansas and fourteen other states, and had acquired substantial acreage of oil and gas leases in Kansas, but its principal office was in Texas. In 1963, the corporation's property, including the leases, was sold, producing a substantial gain. The gain was nonbusiness earnings requiring allocation to the corporate commercial domicile. Although the corporation owned substantial property in Kansas, the court held that its commercial domicile was in Texas, the location of its principal office from which the business was directed.

The Alabama Supreme Court applied a similar analysis in *Anniston Sportswear Corp. v. Alabama*, 275 Ala. 46, 151 So.2d 778 (1963). There, an Indiana corporation had its only manufacturing plant in Alabama, but its principal business office, from which the management operated, was in Indiana. The court found Indiana to be the commercial domicile, despite the fact that all of the man-

ufacturing operations were conducted in Alabama.

These decisions from other jurisdictions applying the UDITPA definition, are consistent with the plain language of the statute, that the commercial domicile of a corporation is the place from which the business is managed or directed, rather than the place where the assets of the business are located and operate.

The UDITPA definition of the phrase "commercial domicile," and the interpretation given the phrase by those courts considering the issue is consistent with the decisions from courts in other non-UDITPA jurisdictions that follow *Wheeling Steel Corp.*, and hold that "commercial domicile" is located in the State where the business taxpayer has its principal place of business and **actual** seat of corporate government.

For example, in *Southern Pacific v. McColgan*, 68 Cal.App.2d 48, 156 P.2d 81 (1945), the taxpayer was incorporated in Kentucky, but conducted no business there. Its railroad transportation business was located in California and six western states. Its board of directors and executive committee met in New York; however, the majority of its employees were in California, along with the legal staff, the engineering staff, and the purchasing staff. The president of the company was also located in San Francisco, and the day-to-day operations of the business were managed there. Based on those facts, the court found California to be the commercial domicile of the corporation.

Likewise, in *Pelto Oil Co. v. Collector of Revenue*, 384 So.2d 533 (La.Ct.App.1980), the taxpayer, Pelto Oil Co., was partially owned by a company called Southdown. Although Pelto's stockholders meeting were held in Houston, and some of its officers worked in Houston, the court held that the taxpayer's commercial domicile was in Louisiana, the state in which the president, secretarial, bookkeeping, leasing, geological, and engineering staff were all located and the state from which the principal business of the taxpayer was directed.

Applying the foregoing analysis to the facts of this case, it is clear that Tennessee was not the corporate commercial domicile for AP II. The uncontradicted evidence shows that all management personnel of AP II resided outside of Tennessee, and held management meetings outside this state. None of the directors or managing officers even traveled to Tennessee during AP II's existence. The corporation's only officer in Tennessee was Sharon Draper. She had no duties at and received no compensation from AP II and was, in fact, a full-time employee of WCLP. The books of AP II were maintained in New York. The corporate advisors for AP II included lawyers, accountants, and investment bankers located in New York or London. AP II's most significant contact with Tennessee was the bank account maintained for the purpose of receiving partnership distributions. The evidence clearly shows that AP II's trade or business was not "directed or managed" from Tennessee. Therefore, Tennessee was not the commercial domicile of AP II.

The Commissioner argues that Tennessee was the corporate taxpayer AP II's commercial domicile because the management activities of the partnership WCLP were concluded in Tennessee. The dissent apparently accepts without question this argument because it relies upon the activities and business domicile of the affiliated corporations and partnership in concluding that Tennessee was the commercial domicile of AP II. It is vital to remember, however, that "[c]ommercial domicile is defined as 'the principal place from which the trade or business of *the taxpayer* is directed or managed.'" As discussed earlier, "the taxpayer," for Tennessee excise tax purposes, is each individual corporation doing business in Tennessee, and in this case, the taxpayer is AP II.

Moreover, unlike the dissent, we think it is relevant that, in the absence of explicit statutory authority, this Court has rejected the notion that the assets and activity of a partnership should be attributed to a corporate partner. *Tollett v. Franklin Equities, Inc.*, 586 S.W.2d 96 (Tenn.1979); *see also Omnicon, Inc., supra,* 688 S.W.2d at 820. There is no statutory authority, explicit or otherwise, to support attributing the assets and activity of the partnership WCLP to

its corporate partner, the taxpayer AP II, for purposes of determining commercial domicile. It follows that the dissent's attribution of the partnership's assets and activity to its corporate partner, AP II, is completely contrary to Tennessee decisional and statutory authority. The dissent's analysis is, therefore, fatally flawed.

We also disagree with the dissent's sweeping conclusion that the practical result of this decision is that a taxpayer can, by the clever use of organizational structure, avoid the payment of taxes. As we noted earlier, the legislature amended the Tennessee excise tax statute in 1993 and expanded the definition of "business earnings" so that the gain derived from the transaction at issue here would be apportionable and taxable as business earnings for years after 1993. Likewise, the conclusion ignores the Tennessee excise tax statutory structure. The taxpayer here was required to and has regularly paid Tennessee excise tax on its earnings which arose in the ordinary course of its business, i.e., business earnings. The sole issue here is whether the gain on a one-time sale of intangible personal property not in the ordinary course of business should be treated as business or nonbusiness earnings. Capital gains derived from the taxpayer's sale of real property located in Tennessee or tangible personal property with a situs in this state are allocated to Tennessee, without regard to "commercial domicile." *See* Tenn.Code Ann. § 67–4–810(c) (1989).

Commercial domicile only becomes an issue when the gain produced by a transaction is determined to be "nonbusiness earnings." Thus, in order to avoid taxes before 1993 in the manner suggested by the dissent, the taxpayer would be required to structure all transactions so that only "nonbusiness earnings" are produced. "Nonbusiness earnings," as previously discussed, are earnings which do not arise from transactions and activity in the regular course of the taxpayer's trade or business. It would be very difficult to structure a business so that all gains are produced by transactions and activity outside the regular course of the taxpayer's trade or business.

Moreover, if the Commissioner is concerned that taxes are being evaded or avoided, he has the statutory power to require a group of related corporations to file a consolidated return and to allocate income between them accordingly. The Commissioner did not choose to use that power in this case, and, therefore, we can only conclude that the Commissioner had no concern that taxes were being avoided. Finally, we note that the dissent's statement that no other jurisdiction has sought to tax AP II on the basis of its commercial domicile is both irrelevant to the issue in this case and incorrect. The record is completely silent on that point.

Our conclusion that the taxpayer's commercial domicile is not in Tennessee is based firmly upon the plain and clear language of the statute and established Tennessee precedents, rather than "form," as alleged by the dissent. We cannot ignore settled tax principles established in Tennessee case law and crystal clear statutory language to reach a taxable result.

### *CONCLUSION*

Because we have determined that the capital gain realized from the 1988 sale of AP II's partnership interest in WCLP constituted nonbusiness income allocable outside Tennessee, it is not necessary to address the other issues raised in this appeal. Accordingly, the Chancellor's decision is reversed, and we hold that AP I is entitled to a refund of corporate excise taxes in the amount of $7,816,632.00, plus statutory interest. The costs of this appeal are taxed to the defendant, Commissioner of Revenue, and this case is remanded to the Chancery Court for a determination of the reasonable attorneys' fees and litigation expenses to which AP I is entitled under Tenn.Code Ann. § 67–1–1803(d) (1989 & Supp.1993).

O'BRIEN, C.J., and DROWOTA and BIRCH, JJ., concur.

REID, J., dissents.

REID, Justice, dissenting.

I concur with the holding that, under prior decisions of this Court,[1] the proceeds from

---

1. *See Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87 (Tenn.1993); *Federated Stores Realty,*     *Inc. v. Huddleston,* 852 S.W.2d 206 (Tenn.1992).

the liquidation of the partnership interest owned by Associated Partnership, Inc. are "non-business earnings" within the meaning of the statute applicable at the time of the liquidation.

However, I would hold that the commercial domicile of the taxpayer was Tennessee and, therefore, pursuant to T.C.A. § 67–4–810, the earnings realized on the liquidation are subject to allocation to Tennessee.

The majority is guided by form rather than principle, and, as stated in *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143 (1936), "make[s] a legal fiction dominate realities." The effect of the decision is that taxpayers can, by the clever use of organizational structure, stay at least one step ahead of the state's taxing authority and avoid the payment of taxes. In this case, a net gain of more than $122 million goes untaxed by Tennessee, or any other state, because the owner of the partnership interest sold was careful to remain outside the state of Tennessee while engaged in any activity that affected its investment. The business activity, which generated these profits realized by the absentee owner upon liquidation, utilized all the direct and indirect services provided by state and local governments, including police and fire protection, schools, health services, streets and roads, and the courts. The legislature intended that Tennessee collect the modest tax imposed on these gains and a proper interpretation of its enactments would accomplish that purpose.

In Tennessee, "non-business earnings" are allocated pursuant to the provisions of Tennessee Code Annotated Section 67–4–810 (1989). An interest in a partnership is intangible personal property. *Omnicon, Inc. v. King*, 688 S.W.2d 818 (Tenn.1985). "Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state." T.C.A. § 67–4–810(c)(3) (1989).

"Commercial domicile" is defined as "the principal place from which the trade or business of the taxpayer is directed or managed." T.C.A. § 67–4–804(a)(2) (1989 & Supp. 1993). Commercial domicile is a legal concept developed to enable the state which gives the greatest protection and benefits to a corporation, rather than the state of "legal" domicile or incorporation, or even the state in which legal control of the corporation is exercised, to recover a tax for the privilege of doing business. The term, "commercial domicile," originated in the United States Supreme Court decision *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 56 S.Ct. 773, 80 L.Ed. 1143 (1936), in which the Court held that refusal to allow taxation of a foreign corporation by a state in which the business has its commercial domicile would be "to make a legal fiction dominate realities." *Id.* at 211, 56 S.Ct. at 777. *Wheeling Steel Corp.* and other cases construing "commercial domicile," though few in number, establish definite legal principles that, when applied to the corporate taxpayer and the intangibles being taxed, determine commercial domicile for taxation purposes. Those *principles* applied to the facts in this case establish that Associated Partnership II's commercial domicile was in Tennessee.

The business of all the affiliated legal entities in this case, 13–30 Group and 13–30 Corporation prior to the restructuring, and Associated Partnership I, Inc., Associated Partnership II, Inc., Whittle Communications Limited Partnership and Whittle Communications, Inc. after the restructuring, was publishing. The person primarily responsible for the management of the publishing business and the generation of all profits was Christopher Whittle. The publishing business was operated from its headquarters in Knoxville, Tennessee, with Whittle in control. Neither the operation nor substantive control of the business left Knoxville after the restructuring.

Prior to the reorganization in 1986, less than two years prior to the sale that generated the net gain to Associated Partnership II, Inc. of $122,400,783, the structure of the Whittle business was a holding company, 13–

30 Group, and a wholly owned subsidiary, 13–30 Corporation, which was the operating company. At that time, Daily Mail had purchased 80.9 percent of 13–30 Group, and, of course, effectively owned the same percent of the operating company.

In 1986, the business was restructured to provide a means of rewarding Whittle and his associates, who were responsible for the successful operation of the business. The result was a limited partnership, Whittle Communications Limited Partnership, composed of two general partners—Whittle Communications, Inc. and Associated Partnership II, Inc. Whittle Communications, Inc. was a Tennessee Corporation, wholly owned by Whittle and it was solely responsible for the operation of the publishing business. Associated Partnership II, Inc. was owned by a subsidiary of Daily Mail. The limited partners of Whittle Communications Limited Partnership were management employees of Whittle Communications, Inc. As of June 1, 1986, based on capital contributions made as a part of the restructuring, Associated Partnership II, Inc. owned 99 percent of Whittle Communications Limited Partnership, and Whittle Communications, Inc. and the limited partners owned one percent.

The partnership agreement provided that Associated Partnership II, Inc. was entitled to a "preferential rate of return" on its capital contribution of $141 million. After paying to Associated Partnership II, Inc. (i.e. Daily Mail), a preferential rate of return, Whittle Communications Limited Partnership made pro rata distributions to the limited partners' capital accounts. The result was that the greater the profit generated by Whittle Communications, Inc., the operating company, the more valuable became the interests of Whittle and his management associates in the limited partnership. When a one-half interest in Whittle Communications Limited Partnership was sold by all partners, general and limited, 18 months after the restructuring, Associated Partnership, II, Inc.'s interest had been reduced to 66 percent, Whittle Communications, Inc.'s interest had increased to 32 percent, and the limited partners' interests had increased to 12 percent.

The decision to sell, made by Whittle, was agreed to by Daily Mail only because the profits were being generated by Whittle and without him their investment in Whittle Communications Limited Partnership would be seriously impaired. The record shows the decision to make the sale that produced the gain was made by Whittle, followed, of course, by the adoption of appropriate corporate resolutions and the execution of other legal documents. That process demonstrates dramatically that the ultimate management and control of the entire business operation was in Whittle.

Daily Mail's interest in Whittle's publishing business was essentially an investment. The only activity of Associated Partnership II, Inc. was to hold Daily Mail's interest in Whittle Communications Limited Partnership. Daily Mail's right to a "preferential" position with regard to the allocation of profits was not unlike the position of a holder of preferred stock. The Daily Mail Group was composed of more than 150 affiliated entities of which Associated Partnership II, Inc. was only one. Although Associated Partnership II, Inc. was incorporated in Delaware, the only activity of Associated Partnership II, Inc. in Delaware was the ownership of a post office box. Associated Partnership II, Inc. owned no property interests in any other jurisdiction. The infrequent meetings concerning Associated Partnership II's investment in Whittle Communications Limited Partnership were held in New York, Montreal, London, or by telephone. The accountants and lawyers were located primarily in New York, but they did not spend a significant amount of time on Associated Partnership II, Inc.'s activities.

In addition to exclusive management of the ordinary business activities of the partnership, Whittle Communications, Inc. had the power to employ and discharge employees, conduct product development, and buy and sell capital assets and incur debt, except for extraordinary transactions. Whittle Communications, Inc. was designated the "tax matters partner" under Section 6231 of the Internal Revenue Code, and kept all the books and records for Whittle Communications Limited Partnership. Whittle, as CEO of

Whittle Communications Limited Partnership was required to seek the advice of Daily Mail only as to "very high level decisions." In effect, Associated Partnership II, Inc. delegated to Whittle through Whittle Communications, Inc. the power to manage the business of Whittle Communications Limited Partnership. Whittle testified that he "had management control of the business to do as I see fit in the business." Charles Sinclair, the chief executive of Daily Mail, testified that Whittle was "the chief executive" in charge of running the partnership's day-to-day business operations which were carried on in Knoxville. The financial director of the Daily Mail, Saunders, testified that the time he spent on Associated Partnership I, Inc. and Associated Partnership, II, Inc. was "negligible."

More than 75 percent of the corporate tax paid by Associated Partnership II, Inc. was paid to Tennessee for fiscal year 1988, which indicates that in addition to all management functions being performed in Tennessee, the great majority of the partnership's actual business transactions occurred in Tennessee. Every penny of the approximately $144 million earned by Associated Partnership II, Inc. from its creation in 1986 to the end of 1988 was derived from its ownership interest in the Whittle Communications Limited Partnership, which was operated and managed in Tennessee.

No other jurisdiction has sought to tax Associated Partnership II, Inc.'s intangibles on the basis that it is the commercial domicile of Associated Partnership II, Inc. Nor does Associated Partnership II, Inc. point to another commercial domicile in which these intangibles could be taxed.

There are no Tennessee cases dealing with the definition of "commercial domicile"; however, the issue has been considered by courts in other jurisdictions. The majority's interpretation of those decisions from other jurisdictions focuses on the legal structure of the taxpayer rather than upon the principles upon which the holdings are based. In *Wheeling Steel Corp. v. Fox*, West Virginia's attempt to collect property taxes upon the accounts receivable and bank deposits of a Delaware Corporation was challenged on due process and equal protection grounds. In upholding imposition of the property taxes, the Court stated:

> The corporation established in West Virginia what has aptly been termed a "commercial domicile." It maintains its general business offices at Wheeling and there it keeps its books and accounting records. There its directors hold their meetings and its officers conduct the affairs of the corporation. There, as appellant's counsel well says, "the management functioned." The corporation has manufacturing plants and sales offices in other states. But what is done at those plants and offices is determined and controlled from the center of authority at Wheeling. The corporation has made that the actual seat of its corporate government.

298 U.S. at 211, 56 S.Ct. at 778. The United States Supreme Court found the commercial domicile of the corporation to be where "management functioned," where "its officers conduct the affairs of the corporation." The basic principle was thus settled in *Wheeling Steel Corp.* but, since Wheeling Steel Corp.'s business was conducted as a single corporation, the effect of having a complex legal structure for the purpose of conducting one integral business operation was not before that Court.

In *Southern Pacific Co. v. McColgan*, 68 Cal.App.2d 48, 156 P.2d 81 (1945), the Court extended the principle stated in *Wheeling Steel Corp.* and found that commercial domicile is not determined by the location of the holding company that exercises ultimate legal control of the operating corporation. In that case, in which the legal structure was similar to the case before the Court, the corporation was incorporated in Kentucky, its executive committee held meetings in New York, and it operated a railroad business in California and six other states. After reviewing the development of the law whereby a corporation's "commercial domicile" determines the state in which it is subject to taxation, the court stated,

> That the state where ultimate control is exercised is not necessarily the commercial domicile is implicit in the holding in *Smith v. Ajax Pipe Line Co.*, 8 Cir., 87 F.2d 567

[ (1937) ], where the stock of the corporation involved was wholly owned, and therefore the corporation was ultimately controlled, by a holding company located outside the taxing state. When a corporation severs its ties with the state in which it is incorporated and engages in no corporate activities there, but engages in activities elsewhere, the contention that, as a matter of law the only state that can possibly be held to be its commercial domicile is that state where its board of directors meets, is as unrealistic, unsound, and artificial as the concept that the corporation for all tax purposes is domiciled in the state of incorporation. It was to free the law from this last mentioned artificial and fictional concept that the concepts of business situs and commercial domicile were applied by the courts. The true test must be to consider all the facts relating to the particular corporation, and all the facts relating to the intangibles in question, and to determine from those facts which state, among all the states involved, gives the greatest protection and benefits to the corporation, which state, among all the states involved, from a factual and realistic standpoint is the domicile of the corporation. That is partially a question of fact and partly a question of law.

*Id.* 156 P.2d at 99. The court found the commercial domicile to be California. Application of the holding in *Southern Pacific Co.* to the case before the Court would determine the commercial domicile of Associated Partnership II, Inc. to be in Tennessee.

*In the Matter of Vinnell Corp.*, 1978 WL 3943 (Cal.St.Bd.Eq.), the issue was whether the taxpayer's commercial domicile was in California. In holding that even though the board of directors met in California, that state was not the corporation's commercial domicile, the court relied on the test set out in *Southern Pacific Co. v. McColgan.* The court stated,

> It is true that, when required, the board of directors ultimately ratified the broad-ranged management decisions made in the field. But this passive acquiescence, after the fact, is not the active management and control required to establish a commercial

domicile and the ultimate power to tax a foreign corporation's intangible income.

*Id.* at 13.

In *Pacific Western Oil Corp. v. Franchise Tax Board*, 136 Cal.App.2d 794, 289 P.2d 287 (1955), *cert. denied*, 352 U.S. 805, 77 S.Ct. 35, 1 L.Ed.2d 38 (1956), the taxpayer corporation was incorporated in Delaware, meetings of the directors and stockholders were held in New Jersey, and the source of the intangible income was from dividends and sales of stock located outside of California. The taxpayer corporation was engaged in the petroleum business and also held securities in companies engaged in the same business. The trial court found that the corporations in which the taxpayer held stock were connected to the taxpayer's own business and that the commercial domicile of each was in California where "the greater portion of their business affairs and activities were carried on and managed in, and protected by." *Id.* 289 P.2d at 293. In reaching that conclusion, the court considered the location of employees, payroll and records; the salaries of the officers; the extent of business in California; the location of fixed assets; and the fact that no other state had imposed a tax on the income from intangibles, to determine that California was the commercial domicile.

> ... Here, the taxpayer contends that its activities in respect to its intangibles constituted a separate business from its petroleum business and that not Delaware, the state of its incorporation, but New Jersey, where it maintained offices and where its directors met and where its intangible assets were physically held, was its "commercial domicile" with respect to such activities....

> Appellants claim it conducted an investment business. In support of its claim that, during the taxing period involved, taxpayer was engaged in a separate business, distinct from its oil production business, consisting of the handling, the investing, and the managing of its intangible assets, taxpayer points to [the decision to expand by acquiring control of other corporations rather than putting their money into the actual oil operations].

*Id.* at 291. The court found that "The taxpayer permanently held stock in other corporations in the petroleum industry in order to advance its interests in the petroleum industry and did not acquire stock for the purpose of trading in shares." *Id.* at 293. On appeal, the court affirmed the trial court's findings.

*Pelto Oil Co. v. Collector of Revenue,* 384 So.2d 533 (La.Ct.App.1980), involved a business whose legal structure was very similar to that in the case before the Court. The taxpayer, Pelto Oil Co., did business as a division of Southdown, Inc. At the beginning of the assessment period, Southdown owned all the outstanding stock of Pelto. During the assessment period, Southdown's interest in Pelto was reduced to 56 percent of the outstanding stock by value and 83 percent by voting power.

Under a statute that taxed income from securities according to a corporation's commercial domicile, the court held that though four of the eight Pelto officers, including its chairman and chief executive officer, worked in Pelto's office in Houston; stockholders' meetings were held in Houston; two-thirds of the board of directors' meetings were held in Houston; all of the significant management decisions were made at meetings in Houston; most of the oil wells and leases were located outside of Louisiana; legal counsel was located in Houston; and all decisions regarding possible corporate acquisitions by Pelto were made in Houston; the "commercial domicile" was in Louisiana:

> It is the opinion of this court that Pelto "functioned" and its business was managed and carried out in New Orleans. Pelto's principal business function is obtaining geological data and engaging in the production of oil and gas. This function was carried on in New Orleans and not in Houston.... Its books and records of day-to-day operations were kept in New Orleans.... A functioning management controlling employees which kept books, made plans, prepared budgets, made sales, contracted for services, collected money, paid bills, salaries, and other obligations, existed in New Orleans under a president who conducted day-to-day operations....

In language particularly applicable to the case before the Court, the Louisiana court held:

> ... [E]ven if the "high level management decisions" with Pelto were made by Southdown through common officers of Pelto, the detailed implementation and exercise of the policies were left as a matter of business to Pelto in New Orleans.

*Id.* at 539–540.

In *United Gas Corp. v. Fontenot,* 241 La. 488, 129 So.2d 748, 756 (1961), the state of Louisiana assessed for taxation the net gain on the sale by United Gas Corp. of stock in an affiliated corporation, in which United Gas Corp. owned 46.65 percent of the outstanding stock. The Louisiana Supreme Court's description of the taxpayer's corporate structure in that case is not inappropriate to the corporate structure under review in this case:

> [T]his case furnishes an excellent example of the manner in which the threads of holding companies, subholding companies, operating subsidiaries, affiliates, and interlocking officers and directorates served to draw about the management and corporate functions of each as a separate entity draperies meshed of such an impenetrable and tangled mass of intricate manipulations and devices as to require the courts to look into the "realities" of the facts of each case, resulting ... in the development of the "commercial domicile" exception to the mobilia rule as originally applied to the intangible assets of such legal entities....

*United Gas Corp. v. Fontenot,* 129 So.2d at 760. The court's holding speaks directly to the case before the Court:

> The concept underlying the "commercial domicile" exception is that it is the better view to ignore the mere semblance of a domicile of a corporation created by technical compliance with the legal requirements of the incorporating state, ... and to permit, for tax purposes, the substantial domicile of the corporation, based on the actual commercial practices of the particular corporation, to prevail, since that state is, obviously, furnishing the bulk of governmental protection to the corporation.

The significant legal principle established by *United Gas Corp.* is that in determining

the state where the actual control of the business is exercised and the state from which the corporation receives the greatest protection and benefits, the courts must look to the substance of the business operation rather than the legal form or "paper structure."

The majority relies upon *Western Natural Gas Co. v. McDonald,* 202 Kan. 98, 446 P.2d 781 (1968), and *Anniston Sportswear Corp. v. Alabama,* 275 Ala. 46, 151 So.2d 778 (1963). In *McDonald,* the issue was whether income from the sale of oil and gas leases was made in the regular course of business operations or was non-business income. The question of commercial domicile was not at issue in that case. In stating that, "The commercial domicile of Western was in Houston, Texas, therefore, the income from the sale of Western's intangible personal property is not taxable in Kansas," the court was merely recognizing the parties' stipulation that "[Western's] principal office from which the business was directed was in Houston, Texas." Consequently, the finding that the commercial domicile was in Houston is not helpful in resolving the issue in this case.

In *Anniston Sportswear Corp.,* the corporation was incorporated in Indiana, and owned one manufacturing plant in Anniston. The court found Indiana to be the commercial domicile. This case is distinguishable from the case at bar. Even though all of the actual manufacturing operations were conducted in Alabama,

> ... all of [Anniston Sportswear's] activities, other than the strictly manufacturing operations in Anniston, are conducted from its office in Michigan City. All administrative and control functions are performed at Michigan City, including the formulation of administrative policies, the determination of productive capacity, the setting of prices, the acceptance of orders, the purchasing of all raw materials, the preparation of production orders and cutting tickets, and the determination of salaries. Also, payment of the payroll for all supervisory personnel working in Anniston, as well as appellant's officers, is made from the Michigan City office.

151 So.2d at 780. All the activity described in the above quotation, which determined that Indiana was the commercial domicile, were performed in Tennessee in the case before the Court. Contrary to the majority's interpretation, the Anniston Sportswear court's reliance in reaching its holding on the extent of management control of the day-to-day operations of the manufacturing plant supports the proposition that it *is* where the business of the manufacturing plant is managed or directed, that establishes the commercial domicile.

The cases have established that the essential factors in determining the commercial domicile of a corporation are where the substantive, rather than the legal, management functions are performed and where the corporation receives the greatest benefits and protection from state government. The essential and substantive management function of the Whittle affiliated corporations and partnership was performed in Tennessee. In the language of *Wheeling Steel Corporation,* what was done outside Tennessee (New York, London, Canada) was "controlled from the center of authority" at Knoxville. All of the benefits and protections enjoyed by the operating business were provided by the state of Tennessee. No other state has imposed a tax on the gain from the sale and the taxpayer has not designated another state as its commercial domicile.

*Tollett v. Franklin Equities, Inc.,* 586 S.W.2d 96 (Tenn.1979), and *Omnicom, Inc. v. King,* 688 S.W.2d 818 (Tenn.1985), mentioned in the majority opinion, are not in any way relevant to the issue of commercial domicile.

Taxation should not be determined by such superficial circumstances as where the corporate office is located, where the directors meet, and where the profits made by the Tennessee operating company are deposited and managed. Again, in the language of *Wheeling Steel Corp.,* such makes a "legal fiction dominate realities." 298 U.S. at 211, 56 S.Ct. at 777.

I would hold that Associated Partnership II, Inc.'s commercial domicile was in Tennessee and affirm the Chancellor's decision finding the gain subject to taxation in Tennessee.

## ORDER ON PETITION FOR REHEARING

PER CURIAM.

The Appellee, Commissioner of Revenue of the State of Tennessee, has filed a petition for rehearing in this cause, which the Court has considered and concludes should be denied.

It is so ORDERED.